**BALCOR/MORRISTOWN LIMITED PARTNERSHIP, Plaintiff,**

v.

**VECTOR WHIPPANY ASSOCIATES, et al., Defendants.**

**Civ. A. No. 95–641.**

United States District Court,
D. New Jersey.

May 4, 1995.

Walter J. Greenhalgh, Robinson, St. John & Wayne, Newark, NJ, for plaintiff Balcor/Morristown Ltd. Partnership.

William S. Katchen, Terry E. Thornton, Lowenstein, Sandler, Kohl, Fisher & Boylan, Roseland, NJ, for defendant Vector Whippany Associates.

John A. Maher, Summit, NJ, for defendant Misawa Homes Co., Ltd., Tao International, Ltd., Zenro Amemiya and Masaru Hanaoka.

A. Dennis Terrell, Shanley & Fisher, Morristown, NJ, for defendant Schindler Elevator Corp.

### *OPINION*

WOLIN, District Judge.

This matter is before the Court upon the removal of five different actions from the Superior Court of New Jersey, Morris County by Vector Whippany Associates ("Vector"). Presently before the Court are several motions of the parties. Balcor/Morristown Limited Partnership ("Balcor"), Misawa Homes Co., Ltd. and Tao International (collectively "Misawa") and Schindler Elevator Corporation ("Schindler") have moved the Court to abstain from proceeding in this action or in the alternative to remand it back to the state court. Vector has cross-moved to withdraw the reference to the Bankruptcy Court pursuant to this Court's standing order. In addition, Vector has moved for leave to amend its complaint.[1] This matter has been decided based on the written submis-

---

1. Whether these parties are properly styled plaintiff, defendant, movant, or opponent is not germane to the merits herein. Moreover it is confusing in light of the parties' different status in each of the removed litigations and the multiplicity of motions. For the sake of clarity, the Court will simply avoid such labels in this opinion. It suffices to say that the parties may be roughly aligned with Balcor, seeking to return to state court, against Vector, which seeks to continue litigating here.

sions of the parties pursuant to Federal Rule of Civil Procedure 78. For the reasons given below, the Court will deny Vector's motion to amend their complaint. The motion of Balcor, *et alia,* to remand will be granted and the entire action will be remanded to the New Jersey Superior Court, Morris County. All other pending motions will be denied as moot.

## BACKGROUND

Vector has been the owner of a commercial office property on Whippany Road in Morris Township, New Jersey ("Whippany Road") since 1984. Westinghouse Electric Corporation was the single tenant. In 1987 Vector refinanced the building with Balcor. Vector signed a promissory note in the amount of $27,000,000 in favor of Balcor Real Estate Financing Inc. Affidavit of Jane Hund ("Hund Aff."), dated Feb. 24, 1995, Exhibit A (hereinafter "Note"). The Note was secured by a mortgage on the Whippany Road property and an assignment of leases and rents. *Id.,* Exhibit B (hereinafter "Mortgage"), C (hereinafter "Assignment"). The Note, Mortgage and Assignment were subsequently assigned to the Balcor limited partnership. *Id.,* Exhibit D. Westinghouse assigned its lease to Schindler, although Vector claims that Westinghouse remains liable on it. Certification of William Lentini, dated March 11, 1995 ("Lentini Cert.") ¶ 6. Schindler is now the sole tenant. Certification of David W. Phillips, dated Feb. 24, 1995 ("Phillips Cert.") ¶ 17.

In 1992, Schindler began attempting to renegotiate its lease. Verified Petition for Removal, dated Feb. 19, 1995 ("Verified Pet.") ¶ 1. Schindler apparently believed that, because it entered into its lease before the real estate slump of the late 1980's, that it was paying more than market rent. Phillips Cert. ¶ 17. Schindler offered to extend the lease beyond its expiration in 1996 in exchange for reduced rent. Verified Pet. ¶ 3.

Vector maintains that it refused to consent to the reduced rent without a restructuring of its obligations to Balcor, because otherwise receipts would not cover the debt service on the building. *Id.* ¶ 4. Schindler and Balcor

were aware of Vector's position in late 1992 and early 1993. *Id.* ¶¶ 6, 7, Exhibit H at 5.1.

It is alleged by Vector that, by September 1993, the parties had reached a consensus concerning a modification of the lease and concessions by Balcor. Verified Pet. ¶ 8. At this point, Vector maintains that Balcor, through its Vice President Jane Hund, began stalling on finalization of the loan modifications pending approval by their limited partners, Misawa. *Id.* ¶¶ 9–10. William Lentini, a Vector Vice–President, avers that Balcor officials and partners represented to both Vector and Schindler that the loan modification would be approved. Lentini Cert. ¶ 12–14. Vector claims that Balcor was dealing with Schindler directly, and that Balcor wrongfully approved a reduced rent in derogation of Vector's rights as lessor. *Id.* ¶ 17; Verified Pet. ¶ 12. Moreover, Vector claims that Balcor and Hund knew all along that there would be no agreement on their part to modify the loan, because the Misawa limited partners vehemently disapproved the idea early as September 16, 1993. Verified Pet. ¶ 19, Exhibit L.

Balcor submits that Vector and Schindler agreed to the terms of a lease modification between themselves, but that the deal was not finalized at the beginning of 1994. Phillips Cert. ¶¶ 17–18. The Court notes in support of this theory the fact that Schindler wrote to Balcor on January 25, 1994 to assert that the reduced rent was proper under an agreement with Vector effective January 1, 1994, and disassociating itself from any dispute between Balcor and Vector. Verified Pet., Exhibit K.

This alleged interference with its rights under the lease forms the gravamen of Vector's claims and defenses in this litigation. It is argued, in effect, that Balcor and Schindler agreed between themselves to modify the lease, knowing that it would force Vector into default. It must be pointed out, however, that there was never any written agreement that purported to modify either the lease or the terms of the loan. Although the Court expresses no opinion on the matter, an unwritten modification of either would appear to be a violation of both the terms of those agreements, as well as the statute of frauds.

*See, e.g.,* Hund Aff., Exhibit A at 4. Nor is it explained how, before the default, Schindler could have believed that Balcor had authority to modify its lease with Vector. Under Vector's version of events, its claim against Schindler under the lease might be viable, but, without a written modification of the loan, the case against Balcor appears a difficult one to make.

In any event, Schindler's rent payment for January 1994 was less than half the previous amount. *Id.* ¶ 14. On January 15, 1994, Vector defaulted on the Note. Hund Aff. ¶ 10. Balcor elected to exercise its rights under the acceleration provision in the Note, and advised Vector and Schindler that rents should be paid directly to Balcor pursuant to the Assignment. *Id.* ¶¶ 11, 12. On March 23, 1994, Balcor initiated a foreclosure action in Morris County, Chancery Division. Phillips Cert. ¶ 10.

As 1994 progressed, Schindler continued to worry about the status of the lease, and asserted that, if the situation could not be finalized, it would begin plans to move at its termination in 1996. *Id.* ¶ 18. Balcor sought a declaratory judgment from the Morris County Chancery Division that it could negotiate a new lease with Schindler pursuant to the Assignment, and to preserve the value of the mortgaged premises. *Id.* ¶ 19.

Chancery Judge MacKenzie found that both the terms of the Assignment and equitable principles required that Balcor be permitted to negotiate a new lease with Schindler for a substantially reduced rent. *Id.* ¶ 20, Exhibits E, F. The Judge explicitly relied on the language of the Assignment and the importance to the value of the property that Schindler be retained as a long term tenant. *Id.,* Exhibit E at 4. The parties appear to concur that the lease modification terms authorized by Judge MacKenzie are essentially similar to those in place after January 1994, *i.e.,* a rent reduction of about one-third with no modification of the loan terms. *See* Hund Aff. ¶ 20, Verified Pet. ¶ 14 & n. 5, ¶ 29; Phillips Cert. ¶ 20.

Considerable motion practice has taken place. Balcor has lost a motion to dismiss Vector's counterclaims. Vector's claim against Misawa, originally a third-party ac-

tion for tortious interference with contract and economic advantage, etc., was severed and transferred to the Law Division. Another motion for sanctions is apparently pending for failure to timely produce surreptitious tapes of conversations between Schindler and Vector officers. Phillips Cert. ¶ 28. Vector has moved to depose Misawa officers, residents of Japan. *Id.* ¶ 30. Balcor has moved to dismiss Vector's pleadings for failure to appear at depositions ordered by Judge MacKenzie. *Id.*

Additional state court actions have been filed. Both Balcor and Vector have sued Schindler and Westinghouse for rent. Vector has commenced a summary dispossess action against Westinghouse and Schindler. There is a motion pending in the state court to consolidate the lawsuits.

Much of the activity in the case has centered around Judge MacKenzie's decision to allow Balcor to renegotiate the lease with Schindler. Vector threatened Schindler with an action for damages if it acted under Judge MacKenzie's order to renegotiate the lease with Balcor. *See* Hund Aff. ¶ 24, Exhibit I. Balcor has sought sanctions for these threats. Vector filed a motion for reconsideration and applied for a stay pending the motion for reconsideration. Phillips Cert. ¶ 23, Exhibit H. The stay was denied without comment by Judge MacKenzie. *Id.,* Exhibit H.

All of the pending motions were scheduled for a hearing before Judge MacKenzie on December 8, 1994. Hund Aff. ¶ 30. This hearing was not to take place, however, because on that date Vector filed a Chapter 11 bankruptcy petition in the Southern District of New York, Judge Abram. Verified Pet. ¶ 30. Balcor moved for dismissal of the case as a bad faith filing and was denied.

Balcor was successful, however, in winning a vacation of the automatic stay so that it could proceed with the state court foreclosure action. Judge Abram found that Vector's arguments for continuing the stay were simply an attempt to relitigate the issue decided against them by Judge MacKenzie; that Balcor could properly negotiate modified lease terms with Schindler. Certification of

Walter J. Greenhalgh, dated Feb. 24 ("Greenhalgh Cert."), Exhibit D at 20. She found, based on its own admission, that Vector had no equity in the property. *Id.,* Exhibit D at 20, 25. As did Judge MacKenzie, Judge Abram noted the importance of retaining Schindler as a long term tenant to protect the interests of the lender, and further that Vector had presented no other theory under which Balcor's interests would be protected. *Id.,* Exhibit D at 13–14, 20–21.

At the hearing before her, Judge Abram made several statements that are illuminating on how she perceived that the case should go forward. While these statements are not binding on this Court, given that Judge's great experience and familiarity with the case, it behooves the Court to take guidance from them. Judge Abram clearly contemplated letting the foreclosure proceed to fruition before a chapter 11 plan would be confirmed. *Id.,* Exhibit D at 12 ("if I hold the case open until you complete the foreclosure, the debtor has whatever opportunity it has in this case to file a plan"). As to Vector's tort and breach of contract claims, the Judge saw no problem in litigating them to judgment outside of the bankruptcy court. *Id.,* Exhibit D at 16.

Moreover, Judge Abram found that by delaying their petition, and in particular by not filing before the key issue of the lease modification had been decided in state court, Vector had, by its choice of litigation strategy, weakened its claim to have the entire matter litigated in the bankruptcy court. *Id.,* Exhibit D at 21. Although the Judge suggested that removal would have been a possible tactic, she also recognized the difficulties that would arise if removal were attempted as of the hearing date given the many matters already pending in the state court. *Id.,* Exhibit D at 23. In short, Judge Abram was clearly of the opinion that Vector's only hope of chapter 11 relief was if it managed to defeat the foreclosure action in state court and prevail on its other claims there. *Id.,* Exhibit D at 19, 25. She stated: "I think you should go forward in the state court and if you can defeat the foreclosure, more power to you." *Id.,* Exhibit D at 22.

Progress in the state actions was again stymied, however, by Vector's petition for removal filed February 9, 1995. The instant motions followed. At the heart of the matter before the Court is the allegation that the removal is simply another episode in Vector's attempt to travel through as many fora as necessary to avoid adverse decisions in state court. While initially the Court had no opinion on the merit of this contention, referral of the instant motions to the bankruptcy court for this district, or transfer to the Southern District of New York would serve to prolong the delay of which Balcor complains. Therefore, the Court has retained jurisdiction of the abstention and remand motions in the interest of efficiently resolving the question of where this matter should be ultimately litigated.

## DISCUSSION

■ Title 28 U.S.C. § 1334(b) confers original, but not exclusive jurisdiction over all civil proceedings "arising under title 11, or arising in or related to cases under title 11." The Court is satisfied that this case comes within the expansive jurisdictional grant just quoted. The measure of whether a case is "related to" a case under Title 11 has been stated as "whether the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy." *Pacor, Inc. v. Higgins,* 743 F.2d 984, 994 (3d Cir.1984). Where a party has filed a petition in bankruptcy, it would be difficult to imagine a cause of action that would fail this test.

■ Balcor has argued that a defect in the removal petition requires dismissal of the case. It claims that Vector failed to file with the petition all pleadings from the state action as required by Bankruptcy Rule 9027. Which pleadings are missing are not specified however. Nor is it alleged that the petition was untimely. Consequently, Vector would probably be able to cure any flaw, if flaw there is, by refiling with the necessary papers. Rather than require such pointless procedural steps, and because the Court believes Balcor is entitled to the relief it seeks on the merits, the Court will not consider this issue further.

For cases that, like this one, are removed to the federal courts by virtue of the jurisdiction conferred by § 1334(b), the removal statute grants the Court discretion to send the case back to the state court "on any equitable ground." 28 U.S.C. § 1452(b). The bankruptcy jurisdictional statute also contains a special provision for abstention. Title 28 U.S.C. § 1334(c) provides:

> Nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11.

28 U.S.C. § 1334(c)(1). This is the permissive abstention provision.

■ The next subsection, 28 U.S.C. § 1334(c)(2) provides for mandatory abstention. In synopsis, it mandates that (1) where a timely motion is made, (2) the proceeding is based on state law, (3) the proceeding is "related to" a Title 11 case, (4) but not "arising under title 11 or arising in a case under title 11," (5) the action could not have been commenced in federal court absent the bankruptcy jurisdiction, and (6) an action is already commenced and timely adjudication is possible in state court, then the Court *must* abstain from hearing it. 28 U.S.C. § 1334(c)(2); *In re Warren*, 125 B.R. 128, 131 (E.D.Pa.1991). On these facts, the case is outside the removal jurisdiction granted to the federal courts by Congress.

■ The interplay between these three provisions has been the subject of considerable judicial attention. Where mandatory abstention is not applicable, the disposition of each of its six factors will inform the decision whether to exercise permissive abstention or to equitably remand. *See Warren*, 125 B.R. at 132; *In re Taylor*, 115 B.R. 498, 502 (E.D.Pa.1990). As discussed more fully *infra*, where a case falls within the mandatory abstention parameters in all but one particu-

lar, discretionary abstention will often be appropriate.

■ Where abstention is appropriate, or required, remand will follow. *Warren*, 125 B.R. at 130–31; *In re Pacor, Inc.*, 72 B.R. 927, 932 (Bankr.E.D.Pa.1987), *adopted*, 86 B.R. 808, *appeal dismissed*, 1988 WL 235479 (3d Cir.1988). It is frequently held that the standards for deciding whether permissive abstention and equitable remand will be appropriate are substantially the same. *In re Chapman*, 132 B.R. 153, 158 (Bankr.N.D.Ill. 1991); *Gorse v. Long Neck, Ltd.*, 107 B.R. 479, 482 (D.Del.1989); *see In re Mill–Craft Bldg. Sys., Inc.*, 57 B.R. 531, 534–35 (Bankr. E.D.Wis.1986).[2] Indeed, one authority has said that most actions removed from state court will be subject to mandatory abstention. Benjamin Weintraub & Alan N. Resnick, Bankruptcy Law Manual ¶ 6.05[5] at 6–39 (3d ed. 1992).

### 1. Mandatory Abstention

■ Naturally Balcor argues that abstention is mandatory. Although the Court believes that the issue is a close one, it is constrained to agree. Several of the mandatory abstention factors are undoubtedly present. This motion is timely. The foreclosure action, as well as the various claims based on commercial tort and landlord/tenant law are based on state law. As already established, the matter is "related to" a Title 11 action. Finally, a state court proceeding is already well-advanced. Without doubt, the likelihood of a timely adjudication is greater in that forum than if the entire matter were started anew in the federal courts.

Whether there would be jurisdiction in this Court apart from section 1334(b) poses an interesting question. Vector is a New Jersey partnership. Balcor is an Illinois partnership. Misawa is Japanese. Vector claims that this creates an independent source of jurisdiction based on the diversity of the parties. However, Vector has overlooked the fact that Balcor initiated suit in state court.

**2.** The Court is aware of Judge Abram's decision in *In re 666 Assocs.*, 57 B.R. 8 (Bankr.S.D.N.Y. 1985) holding that mandatory abstention is not applicable to removed actions. The Court finds, however, that this holding is against the weight

of the authority on the point. *E.g., Robinson v. Michigan Consol. Gas Co.*, 918 F.2d 579, 584 n. 1 (6th Cir.1990) ("The abstention provisions of 28 U.S.C. § 1334(c)(2) apply even though a case has been removed pursuant to 29 U.S.C. § 1452.").

Vector, as a New Jersey partnership, could not remove a case from the New Jersey state courts except under the bankruptcy removal statute. It might be argued that this brings the case within the mandatory abstention requirement of § 1334(c)(2) that the only basis for federal jurisdiction is the bankruptcy filing. Certainly, if plaintiff does not choose the federal forum, and defendant cannot remove, then the case is not within the removal jurisdiction granted by Congress, and it "could not have been commenced in a court of the United States." 28 U.S.C. § 1334(c)(2).

A more conventional argument is made available by the fact that Schindler is headquartered at Whippany Road, and therefore a citizen of New Jersey for diversity purposes. 28 U.S.C. § 1332(c)(1). However the parties may be aligned, it is obvious that Schindler and Vector are antagonistic. As captioned in the state court, Vector and Schindler are on opposite sides of two of the five removed actions, and so there is no diversity as to these matters. Under Vector's theory of the case, which requires that all of the various claims, cross-claims, and counter-claims be considered as one related dispute, Schindler is a necessary party under Federal Rule of Civil Procedure 19, or, at a minimum, permissively joined under Rule 20. If so, diversity is destroyed, because each party joined under these rules must satisfy the jurisdictional requirements. 13B Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure 2d § 3608 at 454 (1984). The non-diverse controversies within this case are not "separate and independent" claims and so they would not be removable under 28 U.S.C. § 1441(c). Therefore, there is no alternative basis for federal jurisdiction, and this mandatory abstention factor is satisfied.

■ However, it is the issue of whether this case arises under or in a case under title 11 that is the most troublesome here. The influential case of *In re Wood*, 825 F.2d 90, 97 (5th Cir.1987), establishes that the term "core proceedings" subsumes the "arising under" and "arising in a case under" criteria. Bankruptcy courts have relied on the concept of core proceedings in their abstention analy-

ses. *In re Becker*, 136 B.R. 113, 115 (Bankr. D.N.J. 1992). This Court's understanding of the core proceeding concept and its underpinnings is discussed *infra*.

The core/non-core distinction derives from the case of *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). There the Supreme Court ruled unconstitutional the Bankruptcy Act of 1978, 28 U.S.C. § 1471 (repealed). Under the 1978 Act, bankruptcy judges had jurisdiction over any case if it was merely "related to" a Title 11 case. The breadth of this type of jurisdiction has already been discussed.

■ The Court found that this was an improper delegation of Article III power to Article I judges. The Court relied on the public right versus private right distinction of *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. (18 How.) 272, 284, 15 L.Ed. 372 (1855). Public rights are those created by legislative fiat and concern matters arising between the government and the citizens. *Marathon*, 458 U.S. at 67–70, 102 S.Ct. at 2869–71. The Court found that "the restructuring of debtor-creditor relations, which is at the core of the federal bankruptcy power, must be distinguished from the adjudication of state-created private rights, such as the right to recover contract damages.... The former may well be a 'public right,' but the latter obviously is not." *Id.* at 71, 102 S.Ct. at 2871.

■ The Constitution provides that only judicial officers who enjoy the protections of Article III may adjudicate private rights. *Id.* at 58–60, 69–70, 102 S.Ct. at 2870–71. By delegating authority to the Article I bankruptcy judges over private rights in matters merely "related to" Title 11 cases, Congress had violated this principle. The Congress responded with the Bankruptcy Amendments and Federal Judiciary Act of 1984, 28 U.S.C. §§ 151–58, 1408–12, 1452. In section 157, Congress adopted the core/non-core language of *Marathon* and set out an exemplary list of what would be considered core proceedings. Primary jurisdiction over non-core cases was returned to the district courts, but of course the districts quickly propounded standing or-

ders referring these matters back to the bankruptcy courts for report and recommendation.

■ As a matter of jurisdictional power, whether this matter is core or "related to" is not important before this Article III Court. Its relevance lies in the fact that Congress, by virtue of its use of the "arising under" and "arising in" language in section 1334(c)(2), incorporated the core/non-core distinction into the mandatory abstention test.[3] Therefore, although the public/private right distinction is not binding on this Article III Court, it is made relevant to mandatory abstention by the issue of whether this is or is not a core proceeding.

Turning to the facts presented here, it appears that the merits of this question depends on one's point of view of the case. Balcor sees the case as one of a simple, non-recourse note and mortgage in which the mortgagor is in default and owes far more than the value of the property. As assignee of the rents, Balcor believes that it has acted properly to preserve the value of an asset in which the nominal owner no longer has any equity. Any claim Vector may have against Schindler for breach of the lease is a separate matter, remediable by legal damages in a separate action, and none of Balcor's affair.

Vector stresses the connections between the various acts of the parties and the importance of an understanding of the entire controversy to its prospects of continued survival. The gist of Vector's allegations is that Balcor and Schindler agreed between themselves to squeeze Vector out of Whippany Road. With Balcor's connivance, Schindler unilaterally reduced its rent by a third. The scheme was furthered by Balcor's false representations that loan modification would be forthcoming. With a reduced rent stream, Vector was unable to remain current on the loan and so was forced to default, triggering foreclosure and Balcor's rights to renegotiate the lease under the assignment.

■ Under Balcor's view of the case, this looks like a state law case that is before this Court only by virtue of Vector's New York chapter 11 filing. Certainly, Balcor's right to foreclose will be governed by state law, as will the resolution of any contract or tort claims by Vector. Bankruptcy courts have frequently held that an action for foreclosure is not core, *Prairie State Bank v. Allison*, 72 B.R. 476, 478 (D.Kan.1987); *Mill–Craft*, 57 B.R. at 533–34; *see also Warren*, 125 B.R. at 131–32 (petition to strike judgment and void sheriff's sale not core), and they "have consistently been reluctant to retain mortgage foreclosure proceedings removed thereto." *Taylor*, 115 B.R. at 502 (further cases cited). Likewise, an action for pre-petition rent is non-core. *Beard v. Braunstein*, 914 F.2d 434, 443 (3d Cir.1990).

From Vector's perspective, if all of the various controversies presented here are adjudicated together, then this case bears some similarity to a reorganization. If the default on the mortgage was wrongfully induced and foreclosure is avoided, if the mortgagor prevails on its other claims including reinstatement of the original lease, and if, as Vector predicts, the value of Whippany Road increases dramatically,[4] then it is conceivable that Vector could emerge as a viable concern.

■ The clear intent behind Vector's motion to amend its complaint is to re-characterize the causes of action in order to strengthen its argument that this is a core proceeding. The proposed amended complaint seeks equitable subordination of Balcor's claims due to its alleged misconduct, and to avoid the modification of the lease as a fraudulent conveyance of its rights thereunder. Vector's Brief in Support of Motion to Amend the Complaint and Counterclaims

---

3. I frequently observed this is due to a legislative misreading of *Marathon* that interpreted that decision to divest all federal courts of jurisdiction over state law matters that were merely "related to" Title 11 cases. *E.g. In re Branded Prods., Inc.*, 154 B.R. 936, 942 & n. 14 (Bankr.W.D.Tex. 1993) (remarks of Sen. Hatch); 1 Lawrence King, Collier on Bankruptcy ¶ 3.01[b] at 3–77–78 n. 209.

4. It should be noted that Judge Abram found Vector's assertions that the property would increase in value sufficiently to permit the continued viability of the mortgagor to be founded on "some form of wish or hope" and no more. Greenhalgh Cert., Exhibit D at 15.

("Plaintiff's Brief to Amend") at 9–10. Not coincidentally, equitable subordination and fraudulent conveyance are both on the statutory list of core proceedings. 28 U.S.C. 157(b)(2)(H), (K). Moreover, in a single-asset bankruptcy such as this one, it requires no leap of logic to find that foreclosure of that asset and counterclaims against the mortgagee are core as "proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or equity security holder relationship." 28 U.S.C. § 157(b)(2)(O): *see also id.* § 157(b)(2)(C) ("counterclaims by the estate against persons filing claims are core").

Despite the closeness of the question, the Court believes that the foreclosure and the related proceedings are not core proceedings. It appears settled that, whatever the outcome of the other claims, Vector has no equity in Whippany Road. Judge Abram found, based on Vector's admissions, that the property is worth only $16,000,000 at this point. Greenhalgh Cert., Exhibit D at 20, 25 (transcript of hearing). Vector's indebtedness on the loan as of the end of 1994 was $39,000,000 as of December 21, 1994. Hund Aff. ¶ 13. Consequently, looking at the reality of the situation, the foreclosure is not truly "a proceeding affecting the liquidation of the assets of the estate," because Vector remains owner of Whippany Road in name only.

■ The Court also finds that the other claims and counter-claims do not change the character of the proceedings. A counterclaim going to the validity of a mortgage may be considered a core proceeding as affecting the security of a creditor. *In re Gurst,* 75 B.R. 575, 579 (Bankr.E.D.Pa.1987); *In re Shell Materials, Inc.,* 50 B.R. 44, 46 (Bankr. M.D.Fla.1985). That is not the situation here, however, as the validity of the mortgage itself is not challenged.

■ Vector's attempts to re-characterize the events here as a fraudulent conveyance or as requiring equitable subordination are unconvincing. Equitable subordination involves the re-ordering of the priority of creditors. As explained in *In re CTS Truss, Inc.,* 868 F.2d 146, 148–49 (5th Cir. 1989), equitable subordination is limited to cases where a fiduciary of the debtor takes advantage of other creditors, where an outside creditor controls the debtor to the disadvantage of other creditors, or where a creditor defrauds other creditors. The analysis must be made on a "case-by-case basis focusing on fairness to the other creditors." *In re Vitreous Steel Prods. Co.,* 911 F.2d 1223, 1237 (7th Cir.1990). The debtor has no standing even to raise the equitable subordination doctrine. *In re Weeks,* 28 B.R. 958, 960 (Bankr.W.D.Okla.1983).

■ Here it is the debtor who is attempting to assert the doctrine. Furthermore, even under Vector's version of events, Balcor has not interfered with the claims of other creditors. Indeed, as found by Judge Abram, Balcor is the only significant creditor here. The other potential claimants are "trivial." Greenhalgh Cert., Exhibit D at 20. An equitable subordination argument is simply inapposite to this situation.

■ Nor does the doctrine of fraudulent conveyance apply here. This doctrine, codified at 11 U.S.C. § 548, allows a bankruptcy trustee to rescind transfers made by the debtor in anticipation of bankruptcy for the protection of creditors barred from protecting their own interests by the filing of the petition. *In re Clover Donut of White Plains Corp.,* 14 B.R. 205, 210 (Bankr.S.D.N.Y. 1981); Richard I. Aaron, Bankruptcy Law Fundamentals, § 10.07 at 10–53 (1994). The debtor must be a party to the voidable transfer. *Clover Donut,* 14 B.R. at 210; 4 Lawrence King, Collier on Bankruptcy ¶ 548.03 at 548–50 (11 U.S.C. § 548(a)(2)(A) "deals exclusively with transfers made and obligations incurred by a debtor, for less than a reasonably equivalent value"). The alleged transfer of Vector's rights under the lease was not perpetrated by Vector, or anyone who controlled Vector. The Court is well aware that 11 U.S.C. § 548(a)(2)(A) has broadened the concept of fraudulent conveyance to include forced transfers such as foreclosure sales that do not comport with state law. *BFP v. Resolution Trust Corp.,* —— U.S. ——, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994). The Court is satisfied, however, that the doctrine cannot be stretched to cover the situation of a tenant who allegedly breaches a

lease with the debtor. Accordingly, a claim of fraudulent conveyance may not be maintained.[5]

Indeed, the judicial tide appears to have already turned against Vector with respect to this aspect of the case. Judge MacKenzie has already ratified the modification of the lease on the same terms that Vector maintains constitute a fraudulent transfer. This seriously undercuts the argument that the purported lease modification and consequent loan default was fraudulently achieved. It lends color to the theory that Schindler's reduced rent was a rational business decision in the face of a declining rent market and the approach of the end of its lease. Vector found itself in the position of being overexposed on a property that had declined in value. This is a risk of doing business as a commercial real estate developer and is no doubt why Vector bargained for a non-recourse note. It does not amount to a federal case.

Judge Abram's lifting of the stay also has implications for Vector's position. Clearly she did not see the issue of the foreclosure and the lease litigation as so closely touching the essential function her court as to preclude its continuation in the state forum. Greenhalgh Cert., Exhibit D. Nor was she willing to permit the question of Balcor's rights under the assignment to re-negotiate the lease to be re-opened when it had already been litigated before Judge MacKenzie. *Id.* at 21. As quoted in part above, Judge Abram said: "[T]he state court has decided the question, and given that you are attempting to defeat the foreclosure, the property is located in New Jersey, I think you should go forward in the state court and if you can defeat the foreclosure, more power to you." *Id.* at 22.

▮▮▮ The right to protection of the federal courts during reorganization is clearly a public right created by the bankruptcy code, and thus a core matter. Litigation over private, state law rights that seeks to establish the existence of a claim is not a core matter. The difficulty of placing any

particular issue in the correct category is no doubt a function of the fact that while they may be distinct conceptually, they are usually intertwined as a practical matter. The Court's duty is to look into the substance of the matter and decide whether it is core or non-core with respect to the federal bankruptcy jurisdiction. *See In re Republic Reader's Serv. Inc.,* 81 B.R. 422, 427 (Bankr. S.D.Tex.1987). In this instance the Court find that the dispute is non-core. Therefore, all the other criteria being satisfied, mandatory abstention applies.

### 2. Discretionary Abstention and Equitable Remand

▮▮▮ Technically the issues of discretionary abstention and remand need not be reached in light of the holding above. However, the Court has admitted that the mandatory abstention issue is a close one. Therefore, in an excess of caution, the Court will discuss these alternative grounds for its decision to remand this case to the state court.

At the outset, this type of abstention must be distinguished from the judge-made doctrine developed in such cases as *Railroad Comm'n of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), and *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). Thankfully the shifting sands of this area of federal jurisdiction that have proven so difficult for the lower courts, *see, e.g., New Orleans Public Serv., Inc. v. Council of City of New Orleans,* 491 U.S. 350, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989), do not extend to this clear, statutorily created authority to abstain. *Republic Reader's,* 81 B.R. at 425. Here, within the very statute in which Congress creates the federal bankruptcy jurisdiction, the legislature has specified criteria for declining to exercise it. Moreover, Congress provided in the Bankruptcy Reform Act of 1994, Pub.L. No. 103–394, Title I, § 104(b), 108 Stat. 4109 (codified at 28 U.S.C. § 1334(d)), that only a decision *not* to abstain under section 1334(c)(2) may

---

**5.** As Balcor points out, a future involuntary foreclosure sale of Whippany Road and extinction of Vector's equity of redemption, if any, cannot be

considered a transfer, let alone a fraudulent transfer, as it has not happened yet. *Cf.* 11 U.S.C. § 548(d)(1).

be appealed. The appellate courts have no jurisdiction over any other bankruptcy abstention decision. 28 U.S.C. §§ 1334(d). This expression of Congressional intent leads to the conclusion that, in bankruptcy, abstention must play a more prominent part than in other areas of federal jurisdiction. *Republic Reader's,* 81 B.R. at 425 (1334(c) "reflect[s] a clear expansion of the abstention doctrine within the realm of bankruptcy").

▪▪▪ Nonetheless, even though the rules for abstention are clearer in bankruptcy removals, discretionary abstention and remand are only appropriate to a "narrow sphere" of cases. *In re Futura Indus., Inc.,* 69 B.R. 831, 834 (Bankr.E.D.Pa.1987). As the discussion below will demonstrate, the determination is necessarily fact driven. With regard to the facts particular to the case before it, the Court is satisfied that discretionary abstention and remand are appropriate here.

The statute itself lists as grounds for discretionary abstention the interest of justice, comity with state courts and respect for state law. In this case the fact that justice and comity weigh in favor of abstention requires little elaboration. This case has already spent a year in state court. There is a strong possibility that Vector seeks to change forums to avoid adverse rulings there. The inevitable delay involved while a new judge becomes engaged with the issues will obviously work to the detriment of the mortgagee whose mortgagor has been in default since January 1994. All of these facts suggest abstention in the interest of justice. Comity with Judge MacKenzie's court also requires that this Court respect his efforts to manage the case by declining to exercise jurisdiction over it.

The courts have developed a long list of other factors for consideration when discretionary abstention is requested. Among them are: 1) the effect on the efficient administration of the estate if it abstains, 2) the extent to which state law issues predominate over bankruptcy issues, 3) the difficulty or unsettled nature of the relevant state law, 4) whether there is an established state court proceeding on the same issues, 5) any grounds for federal jurisdiction besides the

bankruptcy, 6) the degree of relatedness of the proceeding to the main bankruptcy case and the substance rather than the form of an allegedly core proceeding, and 7) the likelihood that the bankruptcy proceeding represents forum-shopping by the petitioner. *In re Foster,* 105 B.R. 746, 749–50 (Bankr. M.D.Ga.1989) (listing a total of 12 factors).

In this case, each of the above listed criteria either favor abstention, or do not weigh against it. An overarching consideration is the time the case has spent in state court. This guides the Court's findings on several of the factors. Obviously there is an established state court proceeding on the same issues. The effect on the efficient administration of the estate will not be harmed by abstention; resolving the various claims will be quicker in the forum where the process of adjudication is already well underway. Any task left over for the bankruptcy court will be made the simpler thereby.

The Court believes that the likelihood that the removal petition represents forum shopping is high. As already noted, Judge Abram found that the petition and Vector's resistance to the lifting of the automatic stay was really an attempt to gain the benefit of an injunction without posting a bond, and to relitigate Judge MacKenzie's decision concerning Balcor's right to renegotiate the lease. Greenhalgh Cert. Exhibit D at 16–17; *see Futura,* 69 B.R. at 835 (prior relief from automatic stay of state proceedings a factor favoring abstention). Balcor has asserted without contradiction, that numerous motions, including one for contempt sanctions, were on the eve of decision when Vector filed its removal petition. The dubious nature of Vector's attempts to re-characterize the case as involving statutorily defined core proceedings of equitable subordination or fraudulent conveyance has already been discussed. The Court need not make a definitive fact-finding under this factor. It suffices to say that the possibility of forum shopping on these facts is likely indeed. *Republic Reader's,* 81 B.R. at 428 ("All courts should attempt to protect both the state and federal court systems from the illegitimate gamesmanship involved in forum shopping").

**794**

The other factors look to the nature of the proceeding and the issues. As the discussion of the core versus non-core nature of the case illustrates, state law predominates over bankruptcy issues. Vector's attempts to recast the alleged state commercial torts as bankruptcy issues is unavailing. As complete diversity is lacking between the parties, it does not appear that there is any extra-bankruptcy basis for federal jurisdiction.

■ The sixth listed factor is the degree of relatedness of the proceeding to the main bankruptcy case and the substance rather than the form of an allegedly core proceeding. Cases construing the discretionary abstention section have recognized that the Court must look to the reality of the controversy, rather than base their decision on superficial features that appear to place it in one category or another. *See Futura,* 69 B.R. at 835 (court considers degree of relatedness "as a practical matter"). Thus, even where a matter is clearly a core proceeding, discretionary abstention may be appropriate. *In re Ascher,* 128 B.R. 639, 645 (Bankr. N.D.Ill.1991); *In re Muir,* 107 B.R. 13 (Bankr.E.D.N.Y.1989); *Republic Reader's,* 81 B.R. at 427.

■ The analysis under this factor recognizes there is no clean line between cases that require adjudication in bankruptcy court and those that may be heard in another forum. The fact that a matter turns on state law cannot always control. Bankruptcy courts routinely hear matters of state law. *Foster,* 105 B.R. at 750. Nonetheless, here Vector's arguments that this case implicates fundamental bankruptcy principles are overshadowed by the fact that it has no equity in the property. Consequently, the foreclosure can be litigated without reference to any reorganization or liquidation of Vector. In addition, Vector's claims and counter-claims, while indubitably the property of the estate, may be litigated and reduced to a money judgment without the assistance of the bankruptcy court. At that time, the bankruptcy court may divide the proceeds between Vector's minor creditors, or confirm a plan of reorganization, as it sees fit. *See Republic Reader's,* 81 B.R. at 429 (abstention and remand would "in essence" bifurcate the matter with liability and damages to be decided by the state court, and the status and enforcement of the judgment to be settled by the bankruptcy court).

Moreover, where abstention would be mandatory but for the absence of one or another of the required factors, discretionary abstention is likely appropriate. This near-miss rationale is widely adopted. *Board of Directors Olathe Public Library v. Century Office Prods., Inc.,* 164 B.R. 339, 341 (D.Kan. 1994); *Taylor,* 115 B.R. at 502; *Futura,* 69 B.R. at 834. Here the Court has found that, except for some possible ambiguity over whether this is a core proceeding, mandatory abstention would be required. This provides yet another argument supporting discretionary abstention.

■ As already noted, the criteria for remand under section 1452(b) are treated by the courts as overlapping. Indeed the same factors favoring abstention also require that the parties be able to seek an efficient resolution in the state forum. The remand statute permits relief "on any equitable ground." 28 U.S.C. § 1452(b). Where the equities require it, a case may be remanded even though it has been properly removed. The Third Circuit holds that, as long as remand is on equitable grounds, rather than on a legal flaw in the removal, the decision to remand is not subject to appeal. *Pacor,* 743 F.2d at 993.[6]

The Court will not restate all of the many equitable grounds for remand already presented under the rubric of discretionary abstention. The Court merely adds that it would surely be inequitable to abstain and then not permit the matter to go forward in another forum.

### 3. Motion to Amend the Complaint

The foregoing discussion establishes the Court's opinion that the motion to amend the complaint is an unavailing attempt to recast

**6.** The strong criticism directed toward our Circuit's reasoning on this point, *e.g., Sykes v. Texas Air Corp.,* 834 F.2d 488, 489–92 (5th Cir.1987), need not be reached, because here the Court's decision to remand is based on equitable grounds.

this action in terms that would influence the Court's decision on the abstention and remand issues. Because this attempt has failed, the Court will deny the motion as moot. Although it is not necessary to the holding, the Court also notes that there is considerable force to Balcor's arguments that the added counts in the proposed amended complaint do not state a claim. The discussion, *supra*, of the flaws in the equitable subordination and fraudulent conveyance arguments show the serious obstacles to Vector's proposed allegations. The Court presumes that this statement of its opinion will guide the parties in any renewed motion to amend.

## CONCLUSION

For the reasons discussed above, the Court will grant Balcor's motion to abstain and will remand the removed actions to the state courts from which they came. The motion to amend the complaint will be denied.

An appropriate Order is attached.

### *ORDER*

In accordance with the Court's Opinion filed herewith,

It is on this 4th day of May, 1995,

ORDERED that the motion of Balcor/Morristown Limited Partnership, Misawa Homes Co., Ltd. and Tao International, and Schindler Elevator Corporation to remand this action to the Superior Court of New Jersey, Morris County is granted; and it is further

ORDERED that each of the five removed actions that comprise this case is remanded to that part of the New Jersey Superior Court, Morris County in which it originated; and it is further

ORDERED that defendant Vector Whippany Associates' motion to amend their complaint is denied; and it is further

ORDERED that all other pending motions are denied as moot.