In re Robert H. KELLEY and
Anne C. Kelley, Debtors.

Robert H. KELLEY and Anne
C. Kelley, Appellants,

v.

SOUTH BAY BANK, Appellee.

BAP No. CC–95–1410–JHMe.
Bankruptcy No. LA–93–16346–CA.

United States Bankruptcy Appellate Panel
of the Ninth Circuit.

Argued and Submitted May 22, 1996.

Decided Aug. 8, 1996.

Daniel I. Barness, Manhattan Beach, CA, for Appellants.

J. Sheldon Capeloto, Pasadena, CA, for Appellee.

Before: JONES, HAGAN, and MEYERS, Bankruptcy Judges.

## OPINION

JONES, Bankruptcy Judge:

### SUMMARY

A bank loan to the debtors' corporation was secured both by the corporation's assets and the debtors' personal guarantee. After the corporation filed bankruptcy, the debtors stopped paying the storage facility where the corporation's assets were stored. The bank thereafter paid the storage costs to prevent the collateral from being sold by the storage facility. After the debtors filed bankruptcy, the bank stopped paying for storage of the collateral and informed the debtors that it had no further interest in that collateral. Approximately one month after confirmation of the debtors' plan, the debtors objected to the bank's claim, arguing that the bank (1) had lost its right to a deficiency judgment by failing to dispose of the collateral in a commercially reasonable way pursuant to U.C.C. § 9–504; and (2) had lost its right to enforce the personal guarantee by failing to get the debtors' consent to two extensions of the corporate loan. The bankruptcy court overruled the objection to the claim, holding that confirmation of the plan acted as res judicata on the issue of whether the debtors were liable on the debt. **We AFFIRM.**

## I. FACTS

The debtors, Robert H. and Anne C. Kelley, were the sole shareholders of Hawkeye Enterprises, Inc., a manufacturers' representative and distributor of aerospace products. On September 10, 1989, the Kelleys executed a written Guaranty, secured by a deed of trust on the Kelleys' residence, in favor of South Bay Bank. This agreement guaranteed payment and performance of every current and future obligation owed by Hawkeye to South Bay.

On May 31, 1991, Hawkeye borrowed $42,000 from South Bay Bank. As collateral, Hawkeye granted South Bay a security interest in its accounts receivable, contract rights, equipment, furniture, fixtures, and vehicles. The loan originally had a maturity date of September 30, 1991. However, the maturity date was extended twice by Change in Terms Agreements executed between South Bay and Hawkeye. Other than extending the maturity date, the terms of the loan remained unchanged. In both instances, Robert Kelley ("Kelley") signed the Change in Terms Agreement in his capacity as president of Hawkeye. Under the terms of the Guaranty, South Bay was not obligated to obtain a guarantor's consent if the modification of the loan was a simple extension. Presumably for this reason, South Bay did not obtain the Kelleys' consent as guarantors.

On September 23, 1992, Hawkeye filed a chapter 7 petition.[1] It was subsequently classified as a "No Asset" case. At that time, the Kelleys rented two storage units at SS Mini Storage. The units contained both personal property belonging to Hawkeye and personal property belonging to the Kelleys. Kelley met two officers of South Bay on the afternoon of January 22, 1993, at SS Mini Storage to segregate his personal belongings from the Hawkeye collateral.[2] All the Kelleys' personal property was placed in one storage unit while the Hawkeye collateral was placed in the other. Kelley testified that the two bank officers took some of Hawkeye's property, including its bank records and customer list, instead of placing them in storage. South Bay claimed that the Kelleys retained keys and the access code to the new storage space, while Kelley testified that he did not have an access code to the storage facility or a key to the storage unit which contained Hawkeye's property. Instead, he stated that one of the bank officers told him that "he would meet me at anytime and we could go down to and meet and go through the storage facilities."

Hawkeye also owned two automobiles. At the time South Bay obtained possession of Hawkeye's personal property, the two automobiles were being used by two former employees of Hawkeye. Kelley informed South Bay where the two employees could be found. Kelley testified that he did not know whether South Bay ever located and took possession of the vehicles. Kelley did testify on cross-examination that he purchased one of the vehicles at a City of Los Angeles impound sale after it had been deserted by whomever had been driving it.

On February 24, 1993, the Kelleys filed a chapter 11 petition. South Bay filed a proof of claim in the Kelleys' bankruptcy based upon the Guaranty. On May 5, 1993, South Bay filed a motion for relief from the stay to foreclose on the deed of trust on the Kelleys' residence which acted as security for the Guaranty. The Kelleys prevented a ruling on this motion by reaching an agreement with South Bay wherein they paid South Bay adequate protection payments and promised to confirm a plan of reorganization by June, 1993.

On September 15, 1993, South Bay informed the Kelleys that it would no longer pay for storing Hawkeye's personal property

---

1. Unless otherwise indicated, all references to Chapters, Sections and Rules are to the Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.* and to the Federal Rules of Bankruptcy Procedure, Rules 1001, *et seq.*

2. What prompted this meeting is disputed. Kelley testified that on January 22, 1993, an officer of South Bay called and angrily demanded that the Kelleys turn over possession of the collateral

that very afternoon. South Bay, however, alleges that Kelley received a Notice of Lien Sale from SS Mini Storage because he had stopped paying rent. South Bay states that in response to a call from Kelley, it agreed to pay for storage of the Hawkeye property, and laid out the terms of that arrangement in a letter dated January 8, 1993.

at SS Mini Storage. It then relinquished any control over or access to the property. After receiving bankruptcy court approval of their Disclosure Statement, the Kelleys' served it on all creditors on October 21, 1993. The proposed plan provided for payment of South Bay's claim in full over five years at 7% interest. Because South Bay objected to the proposed interest rate, it voted to reject the plan. This resulted in negotiations whereby the Kelleys agreed to raise the proposed interest rate on South Bay's claim to a floating rate of prime plus 3%. In exchange, South Bay agreed to vote for the plan and to relinquish its security interest in Hawkeye's personal property at confirmation.

On January 13, 1994, the bankruptcy court entered an order confirming the Kelleys' Fourth Amended Plan of Reorganization (the "Confirmed Plan"). The Confirmed Plan states that the Kelleys reserved the right to initiate an adversary proceeding, within 30 days of plan confirmation, to contest any claim. In addition, the Disclosure Statement stated that the debt owed to South Bay could be reduced by any recovery South Bay obtained from Hawkeye and also by any counterclaim the Kelleys successfully asserted against South Bay.

Approximately one month after confirmation, the Kelleys filed an objection to South Bay's claim, asserting that South Bay had waived its right to enforce the Guaranty because South Bay had failed to foreclose the Hawkeye collateral in a commercially reasonable manner and had altered Hawkeye's principal obligation to South Bay without obtaining a waiver from the Kelleys of their rights as guarantors.

On October 26, 1994, the bankruptcy court held a hearing on the Kelleys' objection to claim. The first witness called was Robert Kelley. Questioning centered on three principal issues. First, the bankruptcy court directed testimony to the issue of whether South Bay had actually repossessed the collateral and therefore assumed a duty to dispose of it in a commercially reasonable manner. Second, the bankruptcy court sought evidence on whether South Bay's failure to get the Kelleys' consent to the Change in Terms Agreements constituted a waiver of

the Guaranty. Finally, the bankruptcy court wanted testimony on the issue of whether the Kelleys were precluded from objecting to South Bay's claim because a plan had been confirmed.

The bankruptcy court, after listening to Kelley's testimony, and after arguments by both counsel, halted the hearing. The court decided at that point that all other issues were irrelevant, because the Kelleys were barred by res judicata from raising an objection to South Bay's claim. The bankruptcy court reasoned that the Kelleys had known about their counterclaims for some time, but instead undertook several months of negotiations with South Bay in order to secure its vote and obtain a release of its rights to Hawkeye's personal property in return for favorable treatment of its claim. In conclusion, the bankruptcy court held, "[The Kelleys' counterclaims] were not disclosed and there were claims that could have been raised and should have been raised, and I think that they weren't, and therefore, they're precluded now." The Kelleys appeal.

## II. ISSUE

Did the bankruptcy court err in holding that confirmation of Kelleys' plan of reorganization precluded the subsequent assertion of prepetition counterclaims against South Bay's claim?

## III. STANDARD OF REVIEW

█ The preclusive effect of a prior judgment is a mixed question of law and fact in which the legal questions predominate. *In re Watson*, 192 B.R. 739, 745 (9th Cir. BAP 1996). Therefore, we review application of res judicata *de novo*. *See In re Russell*, 76 F.3d 242, 244 (9th Cir.1996).

## IV. DISCUSSION

As they did below, the Kelleys raise various factual and legal issues concerning their claims that South Bay waived its right to enforce the Guaranty by failing to dispose of the Hawkeye collateral in a commercially reasonable manner and by failing to obtain the Kelleys' consent to the two extensions of the Hawkeye loan. However, the bankrupt-

cy court did not decide these issues, and they are therefore not properly before us.[3] Instead, the bankruptcy court ruled that the Kelleys were precluded by res judicata from objecting to the claim.

## A. Res Judicata Effect of a Confirmed Plan

■ Res judicata prevents a party from relitigating a cause of action, thus giving finality to legal proceedings. In order for res judicata to apply, the following four elements must be satisfied: (1) a final judgment on the merits; (2) the judgment was rendered by a court of competent jurisdiction; (3) a second action involving the same parties; and (4) the same cause of action involved in both cases. *In re Heritage Hotel Partnership I*, 160 B.R. 374, 376–77 (9th Cir. BAP 1993), *aff'd*, 59 F.3d 175 (9th Cir.1995).

The Kelleys argue first that the first and fourth elements of res judicata are not satisfied. Second, they argue that even if the elements of res judicata are satisfied, res judicata is not applicable since they specifically reserved their right to bring an objection to South Bay's claim after plan confirmation.

### 1. The Same Cause of Action

■ The Kelleys argue that the plan confirmation process and the subsequent objection to claim are two separate causes of action. This argument demonstrates a misunderstanding of the effect of a chapter 11 plan confirmation. The Kelleys' Confirmed Plan is the same action as the subsequent objection to claim for res judicata purposes,

for a chapter 11 bankruptcy case "comprise[s] all matters pertaining to the debtor-creditor relationship that [the debtor] or any creditors might ... raise[ ] to advance their interests in the proceeding." *Sure–Snap Corp. v. Bradford Nat'l Bank*, 128 B.R. 885, 890 (D.Vt.1991), *aff'd, Sure–Snap Corp. v. State Street Bank & Trust Co.*, 948 F.2d 869 (2d. Cir.1991). We have previously held the same. "All of the [debtor's claims] revolve around the same facts which would determine the treatment of the obligation to [the lender]." *Heritage Hotel*, 160 B.R. at 378. As stated by the Fifth Circuit:

> The loan transaction at the heart of the present litigation was also the source of [the lender's] claim against the estate.... [The lender's] loan ... was the subject of extensive negotiations prior to confirmation of the plan of reorganization. We cannot escape the conclusion that the Howes' present allegations merely assert new theories based on the same nucleus of operative facts that informed their earlier bankruptcy proceedings. The two actions, therefore, constitute the same claim or cause of action for res judicata purposes.

*In re Howe*, 913 F.2d 1138, 1144–45 (5th Cir.1990)[4]; *see also Eubanks v. FDIC*, 977 F.2d 166, 171–72·(5th Cir.1992); *Sure–Snap*, 948 F.2d at 874–75. Therefore, the fourth element of res judicata is satisfied.

### 2. A Final Judgment on the Merits

■ A confirmed chapter 11 plan "operates to preclude the assertion of actions which arose out of the prepetition relationship of the parties, the facts of which were fully known by the debtor." *Id.* at 376. For

---

3. In announcing its decision, the bankruptcy court stated, "It looks like there might have been a good contention that the collateral was not disposed of in a commercially reasonable manner, but I haven't decided that."

4. The Kelleys attempt to distinguish *Howe* by correctly pointing out that in *Howe* the debtors had prosecuted, and lost, an adversary proceeding prior to confirmation. It was a second proceeding, instigated after plan confirmation and based upon different legal theories, that was dismissed by the bankruptcy court under the doctrine of res judicata. Therefore, the Kelleys argue that in *Howe* there were two proceedings specifically concerning the proof of claim at is-

sue. However, the Fifth Circuit later clarified its holding in *Howe*:

> *Howe* differs from the instant case only by virtue of the fact that the debtors in *Howe* instituted pre-confirmation adversary proceedings against the creditor urging theories of recovery which were related to those later pursued post-confirmation. Here, [the debtor] did not bring any adversary proceedings against the [creditor]. We were careful to note in *Howe*, however, that a pre-confirmation adversary proceeding related to the issue later pursued is not a prerequisite for the application of res judicata.

*Eubanks v. FDIC*, 977 F.2d 166, 174 (5th Cir. 1992).

that reason, a confirmed chapter 11 plan is a "final judgment" for purposes of res judicata.

It is now well-settled that a bankruptcy court's confirmation order is a binding, final order, accorded full *res judicata* effect and precludes the raising of issues which could or should have been raised during the pendency of the case, such as typical lender liability causes of action.

*Heritage Hotel*, 160 B.R. at 377 (and cases cited therein); *see also Eubanks*, 977 F.2d at 170–71 ("There is little doubt that the bankruptcy court's confirmation order is binding and final, and we accord it the weight of a final judgment for res judicata purposes."); 11 U.S.C. § 1141(a) (". . . the provisions of a confirmed plan bind the debtor .. and any creditor ...."). Therefore, the first element of res judicata is also met.

### 3. *Could and Should the Kelleys Have Raised These Counterclaims Prior to Plan Confirmation?*

■ As stated in both *Howe* and *Heritage Hotel*, even if the four elements of res judicata are met, this doctrine only precludes the assertion of issues that "could or should have been raised during the pendency of the case...." *Heritage Hotel*, 160 B.R. at 377; *Howe*, 913 F.2d at 1145; *see also Allen v. McCurry*, 449 U.S. 90, 94, 101 S.Ct. 411, 414, 66 L.Ed.2d 308 (1980) ("res judicata ... precludes the parties ... from relitigating issues that were or could have been raised in that action"). The bankruptcy court in the instant appeal specifically held that "there were claims that could have been raised and should have been raised...." This conclusion is supported by the facts in the case.

The Kelleys knew about the circumstances that gave rise to their first counterclaim—improper modification of the underlying obligation—at the time Robert Kelley signed the first Change in Terms Agreement as president of Hawkeye on October 2, 1992. This occurred 4½ months before the Kelleys filed bankruptcy and well over a year before plan confirmation. The Kelleys knew about their second counterclaim—improper disposition of Hawkeye's collateral—for 4 months before plan confirmation and at all times during negotiations with South Bay over treatment

of South Bay's claim. Therefore, the bankruptcy court correctly concluded that the Kelleys *could* have raised these issues before plan confirmation. The next issue is whether the Kelleys *should* have raised these issues.

■ Bankruptcy Code policy favors disclosure by the debtor of all potential causes of action. For example, § 521(1) requires a debtor to file a schedule of his assets and liabilities. 11 U.S.C. § 521(1) (1994). This schedule includes any claims or counterclaims he has against its creditors. The Kelleys made no mention of any possible counterclaims against South Bay in its schedules.

■ Under § 1125(b), a debtor may not solicit acceptance of his plan until he provides each party with a court-approved, written disclosure statement which contains "adequate information." *Id.* § 1125(b). Adequate information is defined as information which is sufficiently detailed enough to "enable a hypothetical reasonable investor ... to make an informed judgment about the plan." *Id.* § 1125(a). Courts have held that, "Adequate information would necessarily include prospective tort claims against the secured creditors for damages far in excess of the value of those creditors' secured claims." *Sure–Snap*, 128 B.R. at 890–91. Carrying this reasoning one step further, adequate information should also include potential counterclaims against a secured lender which would extinguish that lender's entire claim.

Even more to the point, § 1141(a) binds the debtor and all creditors to the terms of a confirmed plan. For this reason,

A debtor should state in the plan its intention to pursue objections to claims or other *specific* litigation postconfirmation in the bankruptcy court.... The terms of the confirmed plan bind the debtor. Creditors vote on the plan on the basis of how the plan treats their claims. Creditors might vote differently on a plan that provides for postconfirmation challenges to their claims. In addition, § 1141(a) tells creditors that they should expect payment of their claims according to the terms of the confirmed plan. If the plan does not provide for any

postconfirmation challenges to claims, the debtor is bound to pay on those creditors' claims as provided for by the plan.

*In re Holly's, Inc.*, 172 B.R. 545, 566 n. 26 (Bankr.W.D.Mich.1994), *aff'd*, 178 B.R. 711 (W.D.Mich.1995).

The policy of the Bankruptcy Code supports the bankruptcy court's decision that the Kelleys *should* have raised their counterclaims prior to plan confirmation. The Kelleys, however, argue that they did raise these counterclaims prior to confirmation by reserving their right to object to South Bay's claim after confirmation.

#### 4. *Specific Reservation of Rights*

 If a confirmed plan expressly reserves the right to litigate a specific cause of action after confirmation, then res judicata does not apply. *Sure–Snap*, 128 B.R. at 888; *In re Hooker Invs., Inc.*, 162 B.R. 426, 433 (Bankr.S.D.N.Y.1993). On the other hand, if the debtor fails to mention the cause of action in either his schedules, disclosure statement, or plan, then he will be precluded from asserting it postconfirmation. *Heritage Hotel*, 160 B.R. at 375. Even a blanket reservation by the debtor reserving "all causes of action which the debtor may choose to institute" has been held insufficient to prevent the application of res judicata to a specific action. *Hooker Investments*, 162 B.R. at 433 (citing *In re Micro–Time Management Systems, Inc.*, 983 F.2d 1067 (Table), 1993 WL 7524 at *4, *5 (6th Cir.) (unpublished disposition), *cert. denied*, 510 U.S. 906, 114 S.Ct. 287, 126 L.Ed.2d 237 (1993)).

The Kelleys argue that they did specifically reserve their right to bring their objection to claim after confirmation. As evidence, they point to several paragraphs in their Confirmed Plan and Disclosure Statement.

 (a) *Language in the Confirmed Plan*. In their Confirmed Plan, the Kelleys state:

Except as otherwise ordered by the Bankruptcy Court pursuant to Section 4.3 below, the terms and conditions of the security interests of South Bay Bank shall remain unaltered by this Plan.

Section 4.3(b) of the Confirmed Plan states:

Within thirty (30) days of the date of Plan Confirmation, the Debtors shall initiate adversary proceedings to contest the amount, allowability, priority and/or secured status of any claims which the Debtors believe are not proper. The Debtors may at the same time bring any counter-claims that they believe proper against any creditors asserting claims. The Debtors shall diligently pursue all such adversary proceedings. The Debtors shall not contest the claim of City National Bank, which claim the Debtors accept in its full amount.

The Kelleys argue that the clear inference of the above language in the Confirmed Plan is that the Kelleys intended to object to South Bay's claim. In addition, the Kelleys point to the language which states specifically that they will not object to City National Bank's claim. This, they claim, is another clear statement that they did intend to object to South Bay's claim. However, the above language is little more than a general reservation of rights, which has been held insufficient to prevent the application of res judicata. *E.g., Hooker Investments*, 162 B.R. at 433.

 (b) *Language in the Disclosure Statement*. In their Disclosure Statement, the Kelleys make two references to potential claims against South Bay. In one place they state, "It is possible that the Kelleys may have various counter claims against South Bay Bank." At another point they state, "Also, as noted above, the proper amount of the debt to South Bay Bank may be reduced by … counter claims which the Kelleys may have against South Bay Bank."

Although this is a clearer expression of potential causes of action, it does not mention the grounds for these potential claims. One reason for such vague references to counterclaims in the Disclosure Statement may have been that the Kelleys were worried that if South Bay knew they were going to object to their claim, South Bay would never have voted for their plan. Other courts have held that the reservation of rights in a plan must

be more specific than this. *See, e.g., Holly's, Inc.,* 172 B.R. at 566 n. 26.

The instant appeal is very similar to *Heritage Hotel.* In *Heritage Hotel,* as in the instant appeal, the debtor did not schedule any claims against the lender in its schedules. *Heritage Hotel,* 160 B.R. at 375. In *Heritage,* the bankruptcy court denied the lender's request for relief from the stay on the condition that the debtor gain approval of its disclosure statement by a certain date. *Id.* In the instant appeal, South Bay voluntarily delayed its motion for relief from the stay after the Kelleys promised to make adequate protection payments and confirm a plan by a certain date. In both *Heritage Hotel* and the instant appeal, neither the plan nor disclosure statement mentioned any specific claims or imminent lawsuits against the lender, but instead provided for full payment of the debt. *Id.* at 375–76. In *Heritage Hotel,* the debtor filed a state court lender liability action based upon prepetition events six days after plan confirmation and 4 days before the date on which the lender was eligible to foreclose. In the instant appeal, the Kelleys secured South Bay's vote for their plan, then filed an objection to its claim shortly after plan confirmation. For the foregoing reasons, we hold that the Kelleys did not properly reserve their right to object to South Bay's claim.

## B. Equitable Estoppel

In their brief, the Kelleys raise the issue of equitable estoppel. In order to preclude a party from asserting a claim under the doctrine of equitable estoppel, a party must prove four elements:

> (1) the party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the conduct to his injury.

*Heritage Hotel,* 160 B.R. at 378. However, the elements of equitable estoppel—justifiable reliance, the parties' knowledge of the facts, and the estopped party's intent—are factual determinations. *E.g., Sure–Snap,* 128

B.R. at 888 n. 4. Because the issue of equitable estoppel was never raised below, no evidence of equitable estoppel was introduced at trial, and the bankruptcy court did not rely upon equitable estoppel in its ruling, this issue is not properly before us.

## V. CONCLUSION

We **AFFIRM** the bankruptcy court's decision that res judicata precludes the Kelleys' from objecting to South Bay's claim.