**In re COUNTY OF ORANGE, a political subdivision of the State of California, Debtor.**

**Bankruptcy No. SA 94–22272 JR.**

United States Bankruptcy Court, C.D. California.

Dec. 31, 1997.

## MEMORANDUM OPINION

JOHN E. RYAN, Bankruptcy Judge.

### I. INTRODUCTION

On June 12, 1996, the County of Orange ("County") filed its original objection to the claim held by Appaloosa Investment Limited Partnership I, Chestnut Investment, Palomino Fund Ltd., Pinto Investors Ltd. (collectively, "Appaloosa") and Belmont Capital Partners II, L.P. (collectively with Appaloosa, the "Noteholders"). The Noteholders hold a secured claim of $64 million (the "Claim") in 1994–95 taxable notes (the "Notes") issued by County.

On September 9, 1996, the Noteholders filed the original motion for summary judgment requesting that the court overrule the objection and allow payment of the Claim under County's Second Amended Plan of Adjustment (the "Plan"). At a status conference on September 19, 1996, I granted County's request for discovery to determine whether Appaloosa was the correct party in interest. At a hearing on June 10, 1997, I held that Appaloosa was the purchaser of the Notes and that an actual transfer of the Notes took place when Appaloosa purchased the Notes from Merrill Lynch & Co., Inc. ("Merrill Lynch").

On June 27, 1997, County filed its second amended objection (the "Objection") to the Claim. On August 5, 1997, the Noteholders filed an amended motion for summary judgment (the "Motion") to have the Objection overruled and the Claim allowed and paid. County opposed the Motion, and after a hearing on September 23, 1997, I took the matter under submission.

### II. JURISDICTION

I have jurisdiction over this case pursuant to 28 U.S.C. § 157(b)(1) (bankruptcy courts may hear cases arising under title 11) and 28 U.S.C. § 1334(b) (district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11). This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B).

In addition, I retained jurisdiction under the terms of the Plan and confirmation order

Bruce Bennett, Hennigan, Mercer & Bennett, Los Angeles, CA, for Debtor.

Patrick C. Shea, Pillsbury, Madison & Sutro, San Diego, CA, for Official Committee of Orange County Investment Pool Participants.

David Pettit, Hedges & Caldwell, Los Angeles, CA; Theodore Gewertz, David C. Bryan, Wachtell, Lipton, Rosen & Katz, New York City, for Appaloosa Investment Limited Partnership and Belmont Capital Partners II, L.P.

to resolve all disputes arising out of the classification or payment of a claim, including objections to the allowance or priority of claims. Venue is proper here pursuant to 28 U.S.C. § 1409(a).

### III. STATEMENT OF FACTS

On December 6, 1994, County filed a voluntary petition under chapter 9 of the Bankruptcy Code (the "Code").[1] The Notes are part of a $600 million issuance of taxable notes (the "Taxable Notes") by County on July 8, 1994. Merrill Lynch underwrote the issuance and purchased all the Taxable Notes for resale in the securities markets. The transaction was evidenced by a contract of purchase (the "Contract of Purchase") between County and Merrill Lynch.

On January 12, 1995, County commenced an adversary proceeding against Merrill Lynch seeking $1.85 billion in compensatory damages for Merrill Lynch's alleged misconduct in implementing an illegal investment scheme using funds of County and other local agencies. County alleged that the issuance of the Taxable Notes was connected to the illegal investment scheme.

On November 30, 1995, Appaloosa purchased the Notes from Merrill Lynch. At the time, the Notes were held in the custody of the Depository Trust Company ("DTC"). Merrill Lynch transferred the Notes to an account that Goldman, Sachs & Co. ("Goldman, Sachs") had with DTC. In turn, Goldman, Sachs' accounts reflect that the various Appaloosa entities are the beneficial owners of the Notes.

On December 8, 1995, Appaloosa sold $12 million of the Notes to Belmont. The transfer of the Notes between Appaloosa and Belmont was effected by a transfer on the accounts of Goldman Sachs to Belmont's broker, Brown Brothers & Harriman & Co. ("Brown Brothers"). Brown Brothers' accounts reflect that it holds $12 million of the Notes for the benefit of Belmont.

On December 1, 1995, the Noteholders filed the Claim in County's case as a secured creditor for $64 million.

On March 18, 1996, County filed the Second Amended Disclosure Statement (the "Disclosure Statement"). At a hearing on March 20, 1996, the Disclosure Statement was approved, subject to changes made on the record. At the confirmation hearing on May 16, 1996, the Plan was confirmed. The order confirming the Plan was also entered on May 16, 1996.

Under the terms of the Plan, all holders of the Taxable Notes were classified in either Class A–1 (secured claims) or B–1 (unsecured claims). All allowed claims in these classes are to be paid in full. On June 11, 1996, County sent a notice to all holders on the Taxable Notes to tender the Taxable Notes. The Noteholders produced the Notes for payment under the Plan. However, County denied payment to the Noteholders.

On June 12, 1996, County filed the original objection, requesting that the Claim be disallowed in its entirety on the grounds that the Noteholders stood as assignees or successors-in-interest to Merrill Lynch and were, therefore, liable for Merrill Lynch's alleged misconduct.

On September 9, 1996, the Noteholders filed the original motion for summary judgment, requesting that I overrule the Objection and allow payment of the Claim under the Plan. County opposed the motion. At a hearing on September 19, 1996, I allowed County additional time for discovery to resolve issues concerning Appaloosa's relationship with Merrill Lynch and to ascertain the correct party in interest.

On June 10, 1997, I held a status conference and ruled that Appaloosa acted independently of Merrill Lynch when it purchased the Notes and received a transfer of the Notes from Merrill Lynch. On June 27, 1997, County filed the Objection in response to my rulings requesting that the Claim be disallowed on three grounds: (1) that the Notes were invalidly issued under California law; (2) that the Notes should be equitably subordinated due to Merrill Lynch's alleged misconduct; and (3) that the Notes should be setoff against Merrill Lynch's alleged misconduct. On August 5, 1997, the Notehold-

1. The Code is set forth in 11 U.S.C. §§ 101–1330 (1997).

ers filed the Motion, seeking to have the Objection overruled and the Notes allowed and paid. After a hearing on September 23, 1997, I took the matter under submission.

## IV. DISCUSSION

In determining whether or not any genuine issues of material fact exist for summary judgment purposes, I must view the evidence in the light most favorable to the nonmoving party. *Kowalski–Schmidt v. Forsch (In re Giordano)*, 212 B.R. 617, 621 (9th Cir. BAP 1997) (citing *Hansen v. United States*, 7 F.3d 137, 138 (9th Cir.1993) and *Hughes v. United States*, 953 F.2d 531, 541 (9th Cir.1992)). "The party moving for summary judgment must show by the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits . . . that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Id.* (quoting Fed.R.Civ.P. 56(c)).

The Noteholders' primary contention is that under Article 8 of the Uniform Commercial Code ("UCC"),[2] they are "holders" of "certificated securities" and are consequently entitled to recover on the Notes unless County can establish a defense or defect going to the validity of the Notes. County responds that the Notes do not constitute certificated securities, and even if they did, the Noteholders are not holders of the Notes. County further argues that if the Noteholders are holders of certificated securities, County has raised a defense or defect going to the validity of the Notes based on equitable subordination, setoff, and invalidity of the Notes under California law. The Noteholders counter that the setoff and equitable subordination arguments are not defenses or defects "going to the validity of the" Notes. They further

argue that County has either waived or is estopped from raising invalidity of the Notes as a defense to the Claim.

The parties do not agree on whether California or New York law governs the dispute. I must, therefore, preliminarily determine: (1) whether the California Commercial Code (the "Cal.Comm.Code")[3] or the New York UCC (the "NY UCC")[4] governs the dispute, (2) whether, under the applicable law, the Notes fall within the definition of certificated securities, and (3) if so, whether the Noteholders are "holders" of certificated securities.

### A. California Law Governs this Dispute.

As an initial matter, in discussing whether to apply the California Commercial Code, both parties assume that the 1984[5] version of Article 8 (the "Former Article 8")[6] under the California Commercial Code applies. However, Former Article 8 was recently revised, effective January 1, 1997 (the "Revised Article 8").[7] My decision to apply Revised Article 8 is discussed at length, *infra*, at section B. However, because the Noteholders' arguments are made under Former Article 8, this section analyzes the choice of law applicability under both § 8106 (Former Article 8) and § 8110 (Revised Article 8, replacing § 8106), as the two sections are substantively similar for choice of law purposes.

County contends that California law controls as the Contract of Purchase between Merrill Lynch and County provides that it will be interpreted, governed, and enforced in accordance with California law. The Noteholders, on the other hand, contend that the dispute is governed by New York law because the purchase and sale agreement (the "Purchase and Sale Agreement") be-

---

2. "UCC § ___." shall refer to the Uniform Laws Annotated "ULA" Uniform Commercial Code (1994).

3. References to the California Commercial Code shall be "Cal.Comm.Code § ___."

4. References to the New York Uniform Commercial Code shall by "NY UCC § ___."

5. The last major amendment to Article 8 occurred in 1984. However, according to the historical and statutory notes, one section, § 8302,

was amended in 1986. As this is the only section that appears to have been amended after 1984, I will treat the last significant amendment to Article 8 as occurring in 1984.

6. References to Former Article 8 shall be "Cal. Comm.Code § ___ (1984)."

7. References to Revised Article 8 shall be "Cal. Comm.Code § ___ (1997)."

tween Merrill Lynch and Appaloosa and the assignment agreement (the "Assignment Agreement") between Appaloosa and Belmont provides that New York Law controls.

Section 8106 of Cal.Comm.Code states:

The law of the jurisdiction of organization of the issuer governs the validity of a security, the effectiveness of registration by the issuer, and the rights and duties of the issuer with respect to all of the following:

(a) Registration of transfer of a certificated security.

(b) Registration of transfer, pledge, or release of an uncertificated security.

(c) Sending of statements of uncertificated securities.

Cal.Comm.Code § 8106 (1984). The UCC Comment to this section states that: "Generally speaking, this section makes the law, including the conflict of laws rules, of the jurisdiction in which the issuer is organized applicable to determine the rights and obligations of the issuer with respect to the security." *Id.* at Cmt. 2.

The Noteholders cite the portion of the legislative comment which provides that "[t]he transfer of certificated securities, effected by delivery, will continue to be governed by present conflict of law rules, not included in this Article [i.e. Cal.Comm.Code § 1105]." *Id.* Section 1105 provides that "when a transaction bears a reasonable relation to this state and also to another state or nation the parties may agree that the law of either of this state or of such other state or nation shall govern their rights and duties." Cal.Comm.Code § 1105 (1984).[8] The Noteholders contend that because the transfer of the Notes between Appaloosa and Merrill Lynch was governed by New York law under the terms of the Purchase and Sale Agreement, New York law should govern.

If the issue in question was the validity of the transfer of the Notes between Appaloosa and Merrill Lynch, the Noteholders would be correct and New York Law, the choice of law as selected by the parties, would govern. However, the Noteholders are not seeking relief here against Merrill Lynch under the Purchase and Sale Agreement. Rather, they seek to collect on the Claim based on their rights and County's obligations arising from the issuance of the Notes. As the UCC Comment to Cal.Comm.Code § 8106 indicates, the law of the jurisdiction of organization of the issuer controls issues related to the rights and obligations of the issuer regarding its securities. Therefore, because County is a California municipality, California law governs matters related to the issuance of the Notes.

This conclusion is further supported by the UCC Comment to the revised § 8106 (now § 8110),[9] which states that:

The principal policy reflected in the choice of law rules in subsection (a) is that an issuer and others should be able to look to a single body of law on the matters specified in subsection (a), rather than having to look to the law of all of the different jurisdictions in which security holders may reside.

Cal.Comm.Code § 8110 (1997), UCC Cmt. 2. Accordingly, California law governs the issues related to County's rights and obligations arising from the issuance of the Notes.

## B. Revised Article 8 Applies.

■ Article 8 of the California Commercial Code was significantly revised, effective January 1, 1997. Section 8603 of Revised Article 8 states that the revisions do "not affect an action or proceeding commenced before this division becomes operative." Cal.Comm.

---

**8.** Section 1105 has remained the same under the 1997 version of the Cal.Comm.Code.

**9.** Section 8110(a) provides that:

The local law of the issuer's jurisdiction ... governs the following:
(1) The validity of a security.
(2) The rights and duties of the issuer with respect to registration of transfer.

(3) The effectiveness of registration of transfer by the issuer.
(4) Whether the issuer owes any duties to an adverse claimant to a security.
(5) Whether an adverse claim can be asserted against a person to whom transfer of a certificated or uncertificated security is registered or a person who obtains control of an uncertificated security.
Cal.Comm.Code § 8110(a) (West.Supp.1997).

Code § 8603(a) (1997). The Claim, the Objection, and the Motion were all filed before January 1, 1997. At first glance, former Article 8 could govern the issues.

However, the UCC Comment to § 8603 provides that

> [t]he reason for revising Article 8 and corresponding provisions of Article 9 is the concern that the provisions of old Article 8 could be interpreted or misinterpreted to yield results that impede the safe and efficient operation of the national system for the clearance and settlement of securities transactions. *Accordingly, it is not the case that any effort should be made to preserve the applicability of old Article 8 to transactions and events that occurred before the effective date.*
>
> Only two circumstances seem to warrant continued application of rules of old Article 8. First, to avoid disruption in the conduct of litigation, it *may* make sense to provide for continued application of the old Article 8 rules to lawsuits pending before the effective date. . . .

Cal.Comm.Code § 8603 (1997), UCC Cmt. (emphasis added). Section 8603 does not state that a court must apply Former Article 8. Instead, the UCC Comment encourages a court to use Revised Article 8 unless circumstances such as ongoing litigation warrant the use of Former Article 8. Here, the specific policy concerns articulated in the UCC Comment strongly favor applying Revised Article 8.

Former Article 8 of the California Commercial Code was last amended significantly in 1984 and, thus, did not incorporate the 1994 UCC Revisions, which were enacted specifically to address the "indirect holding system." The prefatory note to the 1994 UCC Article 8 describes the "indirect holding system" as one in which "the issuer's records do not show the identity of all the beneficial owners" and stock certificates are held by

clearing corporations, not the beneficial owners. ULA UCC Prec. § 8–101, sec. I.D. (1994). Prior to 1994,

> [v]irtually all of the rules of the prior version of Article 8 specifying how changes in ownership of securities are effected, and what happens if something goes awry in the process, were keyed to the concepts of a transfer of physical certificates or registration of transfers on the books of the issuers, yet that is not how changes in ownership are actually reflected in the modern securities holding system.

*Id.* The prior version of UCC Article 8

> did not adequately deal with the system of securities holding through securities intermediaries that has developed in the past few decades. Although the prior version of Article 8 did contain some provisions dealing with securities holding through securities intermediaries, these were engrafted onto a structure designed for securities practices of earlier times.

ULA UCC Prec. § 8–101, prefatory note. Therefore, to *rectify these concerns,* UCC Article 8 was substantially revised in 1994.

Revised Article 8 adopts significant portions of the 1994 UCC Revisions, including UCC § 8–102's general definition section, UCC §§ 8–301 to 8–307, and §§ 8–501 to 8–511.[10] The newly added part 5 of UCC Article 8 (1994), adopted in Cal.Comm.Code §§ 8501–8511 (1997) provides specific rules designed for the indirect holding system. In addition, part 3 of UCC Article 8, adopted in part 3 of Revised Article 8, sets forth new definitions of when "delivery" of a security is effectuated under the indirect holding system. Therefore, applying Former Article 8 blindly, especially when Revised Article 8 was enacted specifically to address and create a body of law to deal with the indirect holding system, would conflict with the UCC Comment to Cal.Comm.Code § 8603 (1997) and common sense.[11]

---

10. These UCC sections are substantially similar to and adopted in Revised Article 8 at Cal.Comm. Code §§ 8102, 8301 to 8307 and 8501 to 8511 *See* Cal.Comm.Code (1997), historical and statutory notes for these sections.

11. Only one court has discussed the effect of Revised Article 8. In *Thomas C. Thompson*

*Sports, Inc. v. Farmers and Merchants Bank of Long Beach (In re Turley),* 213 B.R. 857, 861 (C.D.Cal.1997), the court held that "although there were substantial changes to Article 8 of the Commercial Code that became effective on January 1, 1997, this case is governed by the former Commercial Code since this matter was com-

## C. The Notes Are Certificated Securities Under Revised Article 8.

■ The next issue is whether the Notes fall within the definition of "certificated security" under Cal.Comr1.Code.[12] According to the official statement (the "Official Statement") governing the issuance of the Notes, the Notes "will be issued as fully registered notes, registered in the name of Cede & Co. as nominee of The Depository Trust Company, New York, New York." The DTC has been described as "a limited purpose trust company organized under New York law for the purpose of acting as a depository to hold securities for the benefit of its participants, some 600 or so broker-dealers and banks." ULA UCC Prec. § 8–101, sec. I.C.

The Official Statement further provides that the physical certificates representing the Notes are to remain in possession of the DTC. Actual purchasers, also known as "beneficial owners," such as the Noteholders, can acquire the Notes only under the book-entry system maintained by the DTC and only by purchasing the Notes through certain brokers and dealers who are direct participants under the DTC system. The beneficial owner is not entitled to physical delivery of the Notes. Rather, ownership interests of actual purchasers of the Notes is effected by recordation on the books and records of the broker or dealer. Official Statement, Bolin Decl., Exh. A, at 2.

This holding and transfer scheme is common among publicly traded entities. The official prefatory note to the revised 1994 UCC Article 8 states:

If one examines the shareholder records of large corporations whose shares are publicly traded on the exchanges or in the over the counter market, one would find that one entity—Cede & Co.—is listed as the shareholder of record of somewhere in the range of sixty to eighty percent of the outstanding shares of all publicly traded companies. Cede & Co. is the nominee name used by The Depository Trust Company ... Essentially all of the trading in publicly held companies is executed through the broker-dealers who are participants in DTC, and the great bulk of public securities—the sixty to eighty per cent figure noted above—are held by these broker-dealers and banks on behalf of their customers.

ULA UCC Prec. Note § 8101, sec. I.D. (1994).

County points out that § 8102 of Former Article 8 defines a certificated security as

a share, participation, or other interest in property or an enterprise of the issuer or an obligation of the issuer which is all of the following:

(i) Represented by an instrument issued in *bearer or registered form.*

(ii) Of a type commonly dealt in on securities exchanges or markets or commonly recognized in any area in which it is issued or dealt in as a medium for investment.

(iii) Either one of a class or series or by its terms divisible into a class or series of shares, participations, interests, or obligations.

Cal.Comm.Code § 8102(a) (1984) (emphasis added). County does not dispute that the Notes satisfy § 8102(a)(ii) and (iii). County, argues, however, that the Noteholders have not shown that the Notes are in "registered form" for purposes of 8102(a)(i).[13] Section 8102(d) states:

A certificated security is in "registered form" if *both* of the following apply:

---

menced long before those changes took effect." However, the *Turley* court was not faced with a situation where the security was obtained through an indirect holding system. Consequently, that court was not presented with the same policy considerations presented here.

**12.** The Noteholders initially contend that County "conceded" that the Notes were certificated securities at the September 19, 1996 status conference hearing. However, it is clear from the transcript that County never conceded this point.

Rather, the court asked County's counsel a hypothetical question based on the assumption that the Notes were certificated securities. County's counsel responded within the framework of that specific hypothetical question. Supp. Michaelson Decl., Exh. B, at 20–21.

**13.** The Noteholders do not attempt to argue that the Notes are in "bearer form," as defined in Cal.Comm.Code § 8102(e) (1984).

(i) It specifies a person entitled to the security or the rights it represents.

(ii) Its transfer may be registered upon books maintained for that purpose by or on behalf of the issuer, or the security so states.

Cal.Comm.Code § 8102(d) (1984) (emphasis added).

As the Notes are issued to "Cede & Co.," County contends that Cede & Co. ("Cede") is not "a person entitled to the security or the rights it represents" under § 8102(d)(i) because it is not the beneficial owner. Technically, County is correct. Cede is not entitled to the Notes or the underlying rights of the Notes, but is merely the nominee name used by the DTC to hold securities on behalf of the beneficial owners. However, applying the statute in this manner would cause 60% to 80% of publicly traded securities to fall outside the definition of "certificated security" under Former Article 8, § 8102.

Application of Revised Article 8 eliminates this problem. The definition of "security" under Revised Article 8 encompasses the former definition of "certificated security," as follows:

An obligation of an issuer or a share, participation, or other interest in an issuer or in property or an enterprise of an issuer that is all of the following:

(A) It is represented by a security certificate in bearer or registered form, or the transfer of it may be registered upon books maintained for that purpose by or on behalf of the issuer.

Cal.Comm.Code § 8102(b)(15) (1997) (emphasis added). Therefore, under § 8102(b)(15)(A), the Notes are clearly "securities," as the transfer of the Notes were reflected on "books maintained for that purpose," as evident from the purchase procedure set forth in the Official Statement.

The Revised Article 8 defines a "certificated security" simply as "a security that is represented by a certificate." Cal.Comm. Code § 8102(a)(4) (1997). Here, the Notes clearly are represented by certificates. The Noteholders have submitted a copy of one of the master certificates, which was attached to the Official Statement published by the County, as evidence that the Notes are represented by certificates. Therefore, the Notes are certificated securities under Revised Article 8, § 8102(a)(4) (1997).

### D. *Appaloosa Is Not A "Holder" Of Certificated Securities Under § 8114.*

◼ The Noteholders contend that, based upon Former Article 8, 8105(3)(c), a "holder" of a certificated security is entitled to recover on a certificated security unless the defendant can establish a defense or a defect going to the validity of the security. The language in Revised Article 8, § 8114(c) is the same as former § 8105(3)(c): "If signatures on a security are admitted or established, production of the certificates entitles a holder to recover on it unless the defendant establishes a defense or a defect going to the validity of the security." Cal.Comm.Code § 8114(c) (1997). The dispute is whether the Noteholders are "holders" under either section.

The term "holder" is not defined under § 8102, but is defined under § 1201(20), the general definitional section of Article 1. Section 1201(20) provides that: " 'Holder,' with respect to a negotiable instrument, means the person in possession if the instrument is payable to bearer or, in the case of an *instrument payable to an identified person, if the identified person is in possession.*" Cal. Comm.Code § 1201(20) (1997) (emphasis added). County alleges that the Noteholders are not holders for purposes of § 1201(20) because the Notes are payable to Cede, thereby making Cede the identified person on the Notes. The person in possession is DTC.

Under both Former Article 8 and Revised Article 8, County is correct that the Noteholders would not be considered holders of the Notes as neither Appaloosa nor Belmont are identified on the Notes, nor are they in possession of the Notes. The Noteholders' indirect or beneficial holder status does not satisfy the requisite requirements of § 8114(c). Several reasons support this conclusion.

The driving purpose behind Revised Article 8 was to provide a body of law for the treatment of indirect holders, such as the Noteholders. Under Revised Article 8, part

5, the legislature addressed the rights of indirect holders. "Part 5 of Article 8 sets out a carefully designed system of rules for the indirect holding system. *Persons who hold securities through brokers or custodians have security entitlements that are governed by Part 5, rather than being treated as the direct holders of securities.*" Cal.Comm. Code § 8501 (1997), UCC Cmt. 4. (emphasis added).

The Noteholders qualify as "entitlement holders" and are, therefore, afforded the protections of an indirect holder as found in part 5 of Revised Article 8.

The term "entitlement holder" is defined under § 8102(7). " 'Entitlement holder' means a person identified in the records of a securities intermediary as the person having a security entitlement against the securities intermediary." Cal.Comm.Code § 8102(7) (1997). Here, both the DTC and Goldman Sachs are securities intermediaries.[14] Section 8501(b)(1) states that "a person acquires security entitlement if a securities intermediary does any of the following: (1) Indicates by book entry that a financial asset [15] has been credited to the person's securities account...." [16] Cal.Comm.Code § 8501(b)(1) (1997). Appaloosa acquired a security entitlement to the Notes when Goldman Sachs indicated by book entry that it was holding the Notes on behalf of Appaloosa.[17] Furthermore, the term "security entitlement" itself is defined as "the rights and property interest of an entitlement holder with respect to a financial asset specified in chapter 5 (commencing with Section 8501)." Cal. Comm.Code § 8102(17) (1997). It follows that the term "entitlement holder" derives from, and is in fact defined by, Revised Article 8, part 5. The same analysis is applicable to Belmont's acquisition of the Notes from Brown Brothers.

The California Supreme Court has held that "[t]he goal of statutory construction is to ascertain and effectuate the intent of the Legislature." *Pacific Gas and Elec. Co. v. County of Stanislaus,* 16 Cal.4th 1143, 1152, 69 Cal.Rptr.2d 329, 947 P.2d 291 (1997) (citations omitted). Applying § 8114 to entitlement holders could conflict with the provisions of Revised Article 8, part 5. For example, § 8505 provides that securities intermediaries have certain duties and obligations to ensure that the entitlement holders are afforded the benefits of a payment or distribution made by the issuer. *See* Cal.Comm.Code § 8505 (1997). Part 5 of Revised Article 8 apparently contemplates that the entitlement holder look to the secu-

14. "Securities Intermediary" means either:
 (A) A clearing corporation.
 (B) A person, including a bank or broker, that in the ordinary course of its business maintains securities accounts for others and is acting in that capacity.
Cal.Comm.Code § 8102(a)(14) (1997).

15. "Financial asset," except as otherwise provided in Section 8103, means any of the following:
 (A) A security.
 . . . .
 (C) Any property that is held by a securities intermediary for another person in a securities account if the securities intermediary has expressly agreed with the other person that the property is to be treated as a financial asset under this division. As context requires, the term means either the interest itself or the means by which a person's claim to it is evidenced, including a certificated or uncertificated security, a security certificate, or a security entitlement.
Cal.Comm.Code § 8102(a)(9) (1997).

16. "Securities account" means an account to which a financial asset is or may be credited in accordance with an agreement under which the person maintaining the account undertakes to treat the person for whom the account is maintained as entitled to exercise the rights that comprise the financial asset.

Cal.Comm.Code § 8501(a) (1997). The UCC Comment to § 8501 provides that "several significant relationships clearly fall within the definition of a securities account, including the relationship between ... a broker and customers who leave securities with the broker...." *Id.* at UCC Cmt. 1. Although the Noteholders have not presented specific evidence of an "agreement," there is evidence that Goldman Sachs is treating Appaloosa as the beneficial owner of the accounts related to the Notes. Undisputed Statement of Uncontroverted Facts, Nos. 36, 38. (The Noteholders directed Goldman Sachs to produce the Notes for payment in response to County's notice to tender the Taxable Notes and Goldman Sachs did so).

17. Reply Affidavits of Judy K. Mencher and James Bolin, Bolin Decl., Exhs. B–N (filed under seal).

rities intermediary, not the issuer for recovery.

> If a customer purchases a security through a broker and directs the broker to hold the security in an account for the customer, the customer will never become a "purchaser" of a "security" whose interest therein is governed by the rules of Parts 2, 3, and 4 of Article 8. Accordingly, the customer does not become a "protected purchaser" under Section 8–303. Rather, the customer becomes an "entitlement holder" who has a "security entitlement" to the security *against the broker* as "securities intermediary." See Section 8–501.

ULA UCC Prec. § 8–101, sec. III.C.3 (emphasis added). Allowing Appaloosa to assert direct holder status against County would grant it rights and privileges beyond those permitted under part 5 of Revised Article 8 and beyond what the California legislation specified.

Furthermore, the Supreme Court has held that "[t]he plain meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.'" *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989) (citation omitted) (alteration in original). California courts have also held that:

> The court must look first to the language of the statute; if clear and unambiguous, the court must give effect to its plain meaning. (*Id.*, [*Kimmel v. Goland*, 51 Cal.3d 202,] at pp. 208–209 [271 Cal.Rptr. 191, 793 P.2d 524 (1990)]; *see also Rojo v. Kliger* (1990) 52 Cal.3d 65, 73, 276 Cal. Rptr. 130, 801 P.2d 373....) The role of the court "is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted, or to omit what has been

inserted...." (Code Civ.Proc., § 1858; *People v. White* (1954) 122 Cal.App.2d 551, 554, 265 P.2d 115....).

*People v. Hinks*, 58 Cal.App.4th 1157, 1162–63, 68 Cal.Rptr.2d 440 (1997). When revising Article 8, the drafters were cognizant of the difference between a "holder" and an "entitlement holder." This is evident by the fact that other sections under Revised Article 8, §§ 8102 through 8116 specify when the statute is to be applicable to "entitlement holders." *See, e.g.*, Cal.Comm.Code §§ 8106(d) and (e), 8107(a)(3), and 8110(b)(2) (1997). Therefore, I conclude that by not using the term "entitlement holder," the California legislature intended §. 8114(c) to apply only to direct holders.

Additionally, the case law discussing former UCC § 8–105(3)(c) deals only with direct holders.[18] Both parties discuss the applicability of the *Bank of Honolulu v. Hawaii Corp. (In re Hawaii Corp.)*, 829 F.2d 813 (9th Cir.1987) extensively. However, *Hawaii Corp.* did not involve an indirect holder situation. In that case, the Ninth Circuit was primarily concerned with interpreting UCC 8–207(1), which gives the issuer the right to deal with the registered owner of the stock.[19] In *Hawaii Corp.*, a bank held physical possession of stock certificates in a debtor company as collateral for a loan. However, the registered owner of the stock remained the debtor's principal. The bankruptcy trustee issued a liquidating dividend on the stock. When the bank sought to recover, the trustee objected to the bank's claim, alleging that under the wording of UCC § 8–207(1), the issuer (debtor) need only deal with the registered owner. The trustee argued that the registered owner was debtor's principal, and because the debtor had obtained a release of all his interests in the debtor company, the trustee did not have to honor the bank's claim.

The Ninth Circuit, stating that "it is not appropriate to interpret the Uniform Commercial Code without consideration of other

---

18. *See, e.g., Lapidus v. Hiltzik*, 160 A.D.2d 682, 553 N.Y.S.2d 458, 460 (1990) (holding that where plaintiff had possession of a stock certificate and the signature on the certificates was admitted, plaintiff was entitled to recover on it unless the other party "establishe[d] a ... defect going to the validity of the security (UCC 8–105[3][c])").

19. That section provides that the issuer may "treat the registered owner as the person exclusively entitled to vote, to receive notifications and otherwise to exercise all the rights and powers of an owner." UCC 8–207(1), Haw.Rev.Stat. 490:8–207(1).

sections and the Code's general thrust [of conferring negotiability upon securities]," proceeded to examine how a strict applicability of UCC § 8–207(1) would be inconsistent with other provisions of the UCC, including UCC § 8–105. *Id.* at 815. The court concluded that the trustee's interpretation of § 8–207 would be contrary to the proposition found in § 8–105 that a holder is entitled to recover on the security unless the defendant can establish a "defense or a defect which goes to the validity of the security." [20] *Id.* Therefore, the *Hawaii Corp.* case did not discuss the "holder" issue, as it was assumed that the bank was the holder. *Id.* at 815.

Finally, UCC § 8–114 is a burden of proof section, enacted as "a series of evidentiary rules for actions on securities." Hawkland, Alderman & Schneider, *UCC Series,* § 8–114:01 (1996). As discussed above, Former Article 8, and therefore former § 8105, was enacted with physical holders of stock in mind. Thus, the burden of proof section presumes that the person who possesses the security, on presentment, is the proper owner who is entitled to payment unless the issuer can assert a defense or defect as to the validity of the security. That presumption is properly limited to the direct holder of the security. Logically, it should not extend to an entitlement holder, whose indicia of ownership is not evidenced by possession but by a book-entry on the securities intermediary's account.

For all of the foregoing reasons, the Noteholders are not holders within the meaning of § 8114(c).

**E. There Is A Genuine Issue Of Material Fact As To Whether The Noteholders Had Knowledge Of County's Defenses And Counterclaims Against Merrill Lynch.**

■ In the Objection and opposition to the Motion, County alleges that the Noteholders did not purchase the Notes in good faith and that, unlike the other claimants to the Taxable Notes, the Noteholders had actual and/or constructive knowledge of County's defenses and counterclaims against Merrill Lynch. In their reply, the Noteholders claim that this allegation is false. However, neither party presents sufficient evidence with respect to the allegation.[21] Accordingly, there is a genuine issue of material fact as to whether the Noteholders purchased the Notes in good faith.

The Noteholders, as entitlement holders, are afforded certain protections under Revised Article 8. Therefore, County may be precluded from asserting certain defenses depending on the status afforded to the Noteholders under Revised Article 8. Most notably, § 8502 provides that

[a]n action based on an adverse claim to a financial asset, whether framed in conversion, replevin, constructive trust, equitable lien, or other theory, may not be asserted against a person who acquires a security entitlement under Section 8501 *for value and without notice of the adverse claim.*

Cal.Comm.Code § 8502 (1997) (emphasis added). County framed an argument that the Noteholders were not good faith or bona fide purchasers in the context of Former Article 8. Because I hold that Revised Article 8 applies, the issue needs to be reframed in the context of Revised Article 8. The determination of this issue necessarily depends on the validity of County's allegation that the Noteholders took with knowledge of County's defenses and counterclaims against Merrill Lynch. As stated above, this determination is a question of fact that I cannot resolve at this time.

**F. County Lacks Standing To Raise Equitable Subordination.**

■ By the Objection, County seeks to equitably subordinate the Claim under Code

---

**20.** The court construed the term "defense or defect going to the validity of the security" as one conjunctive phrase, rather than as meaning a "defense" or "defect going to the validity of the security." *Id.*

**21.** County cites to Exh. D (Confidential Mencher Depo.), Exh. E (Breakdown of Objections to the Plan), and various portions of the Plan and Disclosure Statement to establish that the Noteholders had notice or knowledge that County would assert the invalidity defense. However, the cited evidence only tends to establish that Belmont purchased its claim with notice of County's potential validity defenses.

The Noteholders have not submitted any evidence on point. Rather, the Noteholders have set forth various arguments as to why County's allegation is false. Reply, at 1–2.

§ 510(C),[22] which is incorporated into chapter 9 by Code § 901(a). The Noteholders contend that County cannot assert equitable subordination as a matter of law. Both parties discuss the issue assuming that County has standing to raise the issue. However, the Noteholders also argue that County does not have standing to raise equitable subordination as a defense because this doctrine is one reserved for creditors who have been harmed by the inequitable conduct of the claimant. Standing is a key jurisdictional issue, which I am required to address. *General Elec. Capital Auto Lease, Inc. v. Broach (In re Lucas Dallas, Inc.)*, 185 B.R. 801, 804 (9th Cir. BAP 1995).

■■■ "The fundamental aim of equitable subordination is 'to undo or offset any inequality in the claim position of a creditor that will produce injustice or unfairness to other creditors in terms of the bankruptcy results.'" *Bunker Exploration Co. v. Clarke (In re Bunker Exploration Co.)*, 42 B.R. 297, 301 (Bankr.W.D.Okla.1984) (citing *Weeks v. Kinslow (In re Weeks)*, 28 B.R. 958, 960 (Bankr.W.D.Okla.1983)) (quoting *Trone v. Smith (In re Westgate–California Corp.)*, 642 F.2d 1174, 1177 (9th Cir.1981)). The primary issue in an equitable subordination action is not the existence of the debt, but rather the order of payment of the debt. *Slefco v. First Nat'l Bank of Stuttgart (In re Slefco)*, 107 B.R. 628, 644 (Bankr.E.D.Ark.1989). "Whereas the issue in disallowance may be whether the claimant has directed his harmful conduct toward the debtor, the issue in subordination is whether such conduct was directed at other creditors." *Id.* Accordingly, courts have held that "the proper party to seek equitable subordination is the creditor or the trustee acting as representative of the creditor, not the debtor. The debtors have

no standing to raise the doctrine." *In re Weeks*, 28 B.R. at 960. *See also Balcor/Morristown Ltd. Partnership v. Vector Whippany Assocs.*, 181 B.R. 781, 791 (D.N.J.1995).

■■■ County responds that several cases have held that debtors/debtors-in-possession and trustees are the proper parties to assert equitable subordination claims.[23] However, in all of the cases cited by County, it is the creditors, chapter 7 trustee, chapter 11 trustee, or the debtor as the debtor-in-possession who asserts the equitable subordination action, and not the debtor. While a chapter 9 debtor may have the equivalent of certain powers of a trustee, *see* 11 U.S.C. § 902(5) (1994), the chapter 9 debtor does not assume the same fiduciary responsibilities that a trustee has under the Code. Code § 1107(a), which affords the debtor-in-possession with all the rights responsibilities of a trustee, is not incorporated into chapter 9, nor is § 704 incorporated into chapter 9. *See* 11 U.S.C. § 901(a) (1994). Furthermore, under Code § 904, "the court cannot appoint a trustee to manage or control a debtor, whether or not cause exists for such appointment," unlike in a chapter 11 case. *In re Richmond Unified School Dist.*, 133 B.R. 221, 225 (Bankr. N.D.Cal.1991). Therefore, County does not have standing to assert an equitable subordination claim against the Noteholders for its benefit or the benefit of creditors. Because County does not have standing to assert this cause of action, I do not have jurisdiction to address County's equitable subordination claim. *See Hartman v. Summers*, 120 F.3d 157, 160 (9th Cir.1997).

■■■ However, courts have held that a creditor or creditors' committee does have standing to assert equitable subordination.

22. Section 510(c) provides:
[A]fter notice and a hearing, the court may—
(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another claim or all or part of an allowed interest to all or part of another allowed interest; or
(2) order that any lien securing such a subordinated claim be transferred to the estate.
11 U.S.C. § 510(c) (1994).

23. *Bezanson v. Bayside Enters., Inc. (In re Medomak Canning)*, 922 F.2d 895, 902 (1st Cir.1990);

*Audre Recognition Sys., Inc. v. Casey (In re Audre, Inc.)*, 210 B.R. 360 (Bankr.S.D.Cal.1997); *9281 Shore Road Owners Corp. v. Seminole Realty Corp. (In re 9281 Shore Road Owners Corp.)*, 187 B.R. 837, 852 (E.D.N.Y.1995); *In re Melon Produce, Inc.*, 162 B.R. 386, 388–89 (Bankr.D.Mass. 1993); *Century Glove, Inc. v. Iselin (In re Century Glove, Inc.)*, 151 B.R. 327, 332 (Bankr.D.Del. 1993); *Bunker Exploration Co. v. Clarke (In re Bunker Exploration Co.)*, 42 B.R. 297, 302 (Bankr.W.D.Okla.1984).

*In re Weeks,* 28 B.R. at 960; *In re Vitreous Steel Products,* 911 F.2d 1223, 1231 (7th Cir. 1990); *Tennessee Valley Steel Corp. v. B.T. Comm. Corp. (In re Tennessee Valley Steel Corp.),* 183 B.R. 795, 799 (Bankr.E.D.Tenn. 1995); *Aluminum Mills Corp. v. Citicorp North Am., Inc. (In re Aluminum Mills Corp.),* 132 B.R. 869, 885 (Bankr.N.D.Ill. 1991); *Unsecured Creditors' Comm. v. Banque Paribas (In re Heartland Chemicals, Inc.),* 103 B.R. 1012, 1014 (Bankr.C.D.Ill. 1989).

On September 4, 1997, the Official Committee of Orange County Investment Pool Participants (the "Committee") filed a motion to intervene as a party plaintiff in the Objection proceeding. The Committee, appointed in County's chapter 9 case under Code § 1102(a)(1), is comprised of schools, municipalities, special districts, and other government entities who deposited money in the Orange County Investment Pools (the "OCIP"). The Committee sought to intervene specifically in response to the Noteholders' allegation in the Motion that County lacked standing to assert equitable subordination.[24] At a hearing held on September 16, 1997, I approved the Committee's request to intervene. The order was entered on October 9, 1997. Therefore, the Committee has standing to raise the equitable subordination action against the Noteholders.

### G. Both County And The Committee Are Barred From Asserting Equitable Subordination Against The Noteholders.

Even if County had standing to raise the issue, it would be legally precluded from raising equitable subordination against the Noteholders. Although Committee is the correct party in interest for purposes of standing to bring an equitable subordination action against the Noteholders, the Committee cannot legally assert it for the same reasons that County cannot.

### i. County Is Barred By Res Judicata From Asserting Equitable Subordination.

 Code § 944(a) provides that the "provisions of a confirmed plan bind the debtor and any creditor." There are no cases that discuss the effect of § 944 for res judicata purposes. However, it can be said that "the important principal of chapter 9 embodied in section 944(a) is that once a plan has been accepted by the requisite majorities, all creditors are bound by the plan, at ¶ 944.02" (Lawrence King, 15th ed. rev.1997).

 Although Code § 1141(a), which deals with the binding effect of a chapter 11 plan, is not incorporated into chapter 9, § 1141(a) similarly provides that "the provisions of a confirmed plan bind the debtor ... and any creditor...." Therefore, case law dealing with § 1141(a) is instructive. The Ninth Circuit Bankruptcy Appellate Panel ("BAP") has held that

> [i]t is now well-settled that a bankruptcy court's confirmation order is a binding, final order, accorded full res judicata effect and precludes the raising of issues which could or should have been raised during the pendency of the case....

*Heritage Hotel Ltd. Partnership I v. Valley Bank of Nevada (In re Heritage Hotel),* 160 B.R. 374, 377 (9th Cir. BAP 1993), *aff'd,* 59 F.3d 175 (9th Cir.1995). Res judicata does not, however, apply where the confirmed plan "expressly reserves the right to litigate a specific cause of action after confirmation." *Kelley v. South Bay Bank (In re Kelley),* 199 B.R. 698, 704 (9th Cir. BAP 1996).

> On the other hand, if the debtor fails to mention the cause of action in either his schedules, disclosure statement, or plan, then he will be precluded from asserting it postconfirmation. *Heritage Hotel,* 160 B.R. at 375. Even a blanket reservation by the debtor reserving "all causes of action which the debtor may choose to institute" has been held insufficient to prevent the application of res judicata to a specific action.

*Id.* The Plan purports to reserve County's right to "enforce any claims, rights and causes of action that the County may hold against any entity...." Plan, at 43. As in *Kelley,* the reservation of rights provision here would be "little more than a general

---

**24.** *See* Committee's Motion for Leave to Intervene, at 6–7.

reservation of rights," which is ineffective to prevent the application of res judicata.[25] *In re Kelley,* 199 B.R. at 704–05.

 The next inquiry is whether County reserved its right to litigate equitable subordination in the Disclosure Statement. The Disclosure Statement states that any claim asserted by Appaloosa or any of its successors in interest "are disputed by the County because the County has *defenses, counterclaims and/or rights of setoff or recoupment* with respect to such claims based upon the matters described in Sections IV.P and IV. P.4." [26] Disclosure Statement, at 75 (emphasis added). Nowhere in the Disclosure Statement does County specifically mention that it intended to assert an equitable subordination action against the Noteholders.

 Equitable subordination is an unusual equitable remedy that should be applied "only in limited circumstances." *Feder v. Lazar (In re Lazar),* 83 F.3d 306, 309 (9th Cir.1996); *In re Westgate–California Corp.,* 642 F.2d at 1177. Equitable subordination is not a defense, counterclaim, right to setoff or right of recoupment. The common thread in all of the causes of action listed in the Disclosure Statement is that they seek to alter the amount or challenge the validity of the underlying claim.

Setoff and recoupment are forms of counterclaims for procedural purposes. 5 Collier on Bankruptcy, at ¶ 553.11 (Lawrence King, 15th ed. rev.1997) (citing *Security Pac. Nat'l Bank v. Enstar Petroleum Co. (In re Buttes Resources Co.),* 89 B.R. 613, 615 (S.D.Tex. 1988) (additional citation omitted)).

> The Bankruptcy Code does not define the term "counterclaim," yet use of the term in bankruptcy is commonplace. Confusion often arises in defining the concept due to the tendency of many courts to use the

term "counterclaim" interchangeably with the terms "setoff" and "recoupment."

*Id.* (citing *First Union Nat'l Bank v. Abbey Fin. Corp. (In re Abbey Fin. Corp.),* 193 B.R. 89, 94 (Bankr.D.Mass.1996)). Historically, recoupment is the precursor to the compulsory counterclaim, while setoff is the precursor to the permissive counterclaim. *Id.* (citing *Coplay Cement Co. v. Willis & Paul Group,* 983 F.2d 1435, 1440 (7th Cir.1993)). The relevant feature of these causes of action is that they are in essence affirmative defenses that seek to challenge the validity of the underlying claim or seek to reduce the amount of the underlying claim. *Id.* (citing *Jobin v. L.D. Arnot (In re M & L Business Mach. Co. Inc.),* 178 B.R. 270, 272 (Bankr. D.Colo.1995); *Styler v. Jean Bob, Inc. (In re Concept Clubs, Inc.),* 154 B.R. 581, 589 (D.Utah 1993)).

However, equitable subordination, on the other hand, is a legally distinct proceeding which seeks to reprioritize the order of allowed claims based on the equities of the case, rather than to allow or disallow the claim in the first instance. *Francis v. Holmes Land Co. (In re GEX Kentucky, Inc.),* 100 B.R. 887, 891 (Bankr.N.D.Ohio 1988) ("Subordination of a claim and the objection to the claim are two separate and distinct procedures under the Bankruptcy Code with each having a different result"). *See also In re Slefco,* 107 B.R. at 640.

> The subordination of a claim, pursuant to 11 U.S.C. § 510(c), concerns the distribution and classification of an allowed claim based upon principles of equity. The objection to a claim, pursuant to 11 U.S.C. § 502, does not deal with the distribution and classification of a claim but to the allowance of such claim.

*In re GEX Kentucky, Inc.,* 100 B.R. at 891. Therefore, the inquiry as to whether equitable subordination applies does not focus upon

---

**25.** The pertinent statement in the confirmed plan in *Kelley* provided that "the Debtors shall initiate adversary proceedings to contest the amount, allowability, priority and/or secured status of any claims which the Debtors believe are not proper. The Debtors may at the same time bring any counter-claims that they believe proper against any creditors asserting claims." *Id.* at 704.

**26.** The Disclosure Statement also uses similar language in the context of all Class A–1 and B–1 claims and states that "County continues to investigate its defenses, the counterclaims and/or rights of setoff or recoupment with respect to such claims that may be asserted by other holders of Class A–1 and B–1 Claims, and the County reserves its right to assert such rights, claims and defenses as appropriate." Disclosure Statement, at 75.

the validity of the underlying debt at all. Rather, this fact is presumed, or otherwise admitted. *See Hohenberg v. Hohenberg (In re Hohenberg)*, 191 B.R. 694, 700 (Bankr. W.D.Tenn.1996) (observing that the language of Code § 510(c) presumes that courts will be considering allowed claims in subordination disputes). Therefore, the terms of the Disclosure Statement and Plan did not preserve County's right to bring this specific equitable remedy against the Noteholders.

 Additionally, the "Code policy favors disclosure by the debtor of all potential causes of action." *In re Kelley*, 199 B.R. at 703. Section 1125(b) requires that the disclosure statement contain "adequate information." Adequate information means information which is sufficiently specific as to "enable a hypothetical reasonable investor to ... make an informed judgment about the plan...." 11 U.S.C. § 1125(a) (1994). Section 1125 is incorporated into chapter 9 by § 901(a). In other words, the purpose of the disclosure statement is "to give all creditors a source of information which allows them to make an informed choice regarding the approval or rejection of a plan." *Duff v. United States Trustee (In re California Fidelity, Inc.)*, 198 B.R. 567, 571 (9th Cir. BAP 1996).

The concept of adequate information is tied to the finality of the plan. Creditors vote on a plan depending on the manner in which the plan proposes to treat their claims. *In re Kelley*, 199 B.R. at 703–04 (citing *Holly's, Inc. v. Kentwood (In re Holly's, Inc.)*, 172 B.R. 545, 566 n. 26 (Bankr.W.D.Mich.1994), *aff'd* 178 B.R. 711 (W.D.Mich.1995)). Had County indicated its intent to equitably subordinate only the Noteholders' Claim under Class A–1 or B–1, the Noteholders would surely have objected to the confirmation of the Plan on this ground.

 Furthermore, as the Plan or Disclosure Statement did not adequately indicate that County intended to preserve its right to bring an equitable subordination action postconfirmation, the rule that issues that "could or should have been raised during the pendency of the case." are barred by res judicata applies. *In re Kelley*, 199 B.R. at 703–04 (citing *Heritage Hotel*, 160 B.R. at 377). The conduct giving rise to the equitable subordi-

nation claim was the alleged pre-petition misconduct of Merrill Lynch. Such facts were known to County pre-confirmation, as evidenced by the filing of the complaint against Merrill Lynch in this court on January 12, 1995. As such, the intent to assert equitable subordination should have been specifically stated in either the Plan or Disclosure Statement. *In re Kelley*, 199 B.R. at 703–04. Accordingly, the principles of finality and adequate disclosure relating to the plan confirmation process dictate that a cause of action that is known pre-confirmation that would alter a creditor's treatment under the plan must be specifically reserved. If not, the plan proponent is barred by res judicata from asserting the specific cause of action.

*ii. County Cannot Prove That All The Elements Justifying Equitable Subordination Are Present.*

 Even if it were possible to somehow construe the Plan or Disclosure Statement as adequately disclosing County's intent to assert equitable subordination, and, therefore, County is not bound by res judicata, County would not be able to satisfy one element of the three-pronged equitable subordination test. The Ninth Circuit has held that three requirements must be met in order for equitable subordination to apply: "(1) that the claimant engaged in some type of inequitable conduct, (2) that the misconduct injured creditors or conferred unfair advantage on the claimant, *and* (3) that subordination would not be inconsistent with the Bankruptcy Code." *In re Lazar*, 83 F.3d at 309 (citations omitted) (emphasis added).

 The Noteholders contend that subordination would violate the third prong of the test, as subordinating the Claim conflicts with Code § 1123(a)(4). Section 1123(a)(4) is incorporated into chapter 9 by Code § 901(a), and provides:

Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall—

(4) provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest.

11 U.S.C. § 1123(a)(4) (1994). The "cardinal principle of bankruptcy practice" is that "claims within a class should all be treated equally." *In re Huckabee Auto Co.*, 33 B.R. 132, 138 (Bankr.M.D.Ga.1981) (citation omitted). The Ninth Circuit has held that the court must compare the treatment of two or more claims within each class to determine whether the plan provides for equality of treatment of the claims. *Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 787 F.2d 1352, 1358 n. 4 (9th Cir.1986).

Here, County does not purport to equitably subordinate any other claimant to the Taxable Notes under Classes A–1 or B–1 other than the Noteholders. Moreover, the Noteholders certainly did not agree to less favorable treatment under the Plan. Rather, they voted to confirm the Plan with the understanding that if allowed, their claim would be paid fully in accordance with the provisions for distribution under a Class A–1 or B–1 claim. Therefore, to allow subordinate treatment of the Claim would result in the disparate treatment of the Noteholders as compared to other allowed Class A–1 or B–1 claimants. This result is in conflict with Code § 1123(a)(4). *See LTV Steel Co., Inc. v. Aetna Cas. and Sur. Co. (In re Chateaugay Corp.)*, 1993 WL 563068, at *4–5 (Bankr. S.D.N.Y. Dec. 27, 1993) (holding that post-confirmation attempt to equitably subordinate claim of one general unsecured creditor in a class of general unsecured creditors was a violation of § 1123(a)(4)).

County contends that the Noteholders cannot collaterally attack the order confirming the Plan as the Plan was approved in compliance with § 1123(a)(4). However, this argument is unavailing because the Noteholders had no duty to raise an objection to the Plan when the Disclosure Statement and Plan did not expressly discriminate against the Noteholders. County only raised the equitable subordination issue against the Claim post-confirmation. Even if the Noteholders should have known that County might raise the equitable subordination issue post-confirmation, they surely were not required to raise an objection based on speculation. Un-

less the Plan stated otherwise, the Noteholders were justified in looking to the Plan for the treatment of the Claim. Therefore, under the Plan, the Claim should be paid like any other Class A–1 or B–1 claim, if allowed.

The burden to ensure that the proposed plan complies with the Code is properly upon the proponent of the plan. *Everett v. Perez*, 30 F.3d 1209, 1213 and n. 5 (9th Cir.1994) ("burden of proposing a plan that satisfies the requirements of the Code always falls on the party proposing it"). This proposition is based on Code § 1129(a)(2), which is incorporated into chapter 9 by § 901(a). Furthermore, in proposing a plan that complies with the Code, the proponent of a plan has the burden of providing a reasonable basis for the discriminatory treatment of creditors holding similar claims. *In re Eddington Thread Manuf. Co., Inc.*, 181 B.R. 826, 833 (Bankr.E.D.Pa.1995). Accordingly, County bore the burden of properly classifying the Claim. If County intended to discriminate in the treatment of the Claim, County had the burden to justify the separate classification of the Claim.

County also argues that the Claim is not classified under the Plan because only "Allowed Claims" are classified. County contends that the following statement in the Plan supports this proposition: "A Claim is classified and included in a particular Class only to the extent that the Claim is an Allowed Claim in that Class and has not been paid, released or otherwise satisfied before the Effective Date." Contrary to what County contends, this provision is ambiguous as to whether only allowed claims are classified under the Plan. A more plausible reading of this section is that to the extent a claim is ultimately deemed disallowed, the claim is not classified under the Plan. This interpretation is supported by the preceding sentence in the same paragraph of the Plan, which states: "A Claim is classified in a particular Class only to the extent that the Claim qualifies within the description of that Class...." Here, the Claim clearly falls within the Class A–1 or B–1 description of claims relating to the Taxable Notes.[27]

---

**27.** Class A–1 consists of "Secured Claims against the County under or evidenced by the County of

Orange, California 1994–95 $600 million Taxable Notes, as Modified by the Note Extension Agree-

Additionally, the Noteholders correctly point out that even if the Claim is a disputed claim, disputed claims relating to the Taxable Notes are classified under the Plan as A–1 or B–1 claims. The determination of whether the claim is allowable is a separate consideration from determining whether the claim is classified.[28] Therefore, the Noteholders are classified as disputed claimants under either Class A–1 or B–1.

### iii. The Committee Is Barred From Asserting Equitable Subordination.

 To the extent that the Committee alleges that it is not standing in the shoes of County, but rather has standing on its own merit, the Committee would still be legally precluded from asserting equitable subordination. "It is the responsibility and duty of every creditor to participate and protect its own interests in a bankruptcy proceeding." *In re GEX Kentucky, Inc.*, 100 B.R. 887 at 891. The Committee knew or should have known the basis for County's equitable subordination argument against the Noteholders for the same reason that County had pre-confirmation knowledge of this potential cause of action. Neither the Plan nor the Disclosure Statement reserves any right by the Committee to assert any cause of action post-confirmation against the Noteholders.

The Committee did not object to the Disclosure Statement or to the Plan on the grounds that the Noteholders' claim should be separately classified and subordinated on equitable grounds to the payment of the allowed claims of other creditors in order to prevent a violation of § 1123(a)(4). Therefore, a creditor who does not object to the classification of a claim pre-confirmation is precluded by res judicata from later seeking to equitably subordinate that claim post-confirmation. *Id.* at 889.

### H. The Noteholders Have Not Met Their Burden To Show That County Has Waived Or Is Barred From Asserting Invalidity Of The Notes As A Defense To Payment.

The Noteholders argue that County has waived or is barred from asserting the invalidity of the Notes as a defense to payment on the grounds of res judicata, judicial estoppel, or equitable estoppel. In the Objection, County argues that the Notes are invalid under California law for three reasons. First, the entire issuance of the $600 million Taxable Notes are invalid as they were issued in violation of the California debt limitation provision in the California Constitution.[29] Second, the Taxable Notes violate Cal. Gov't Code § 53858, which limits County's issuance of short-term borrowing notes, such as the Taxable Notes, to 85% of County's uncollected taxes, income, and other revenue. County alleges that the Notes were in excess of the statutory limit and, therefore, were invalidly issued. Third, the Taxable Notes were not issued for a valid purpose, because they were issued for the purpose of engaging in a speculative investment scheme.

### i. There Is A Genuine Issue Of Material Fact As To Whether County Waived Its Right to Assert Invalidity As A Defense.

 The Noteholders contend that County has waived its right to assert that the Notes are invalid. The Noteholders rely

---

ments." Class B–1 consists of "Unsecured Deficiency Claims against the County under or evidenced by the County of Orange, California 1994–95 $600 million Taxable Notes, as modified by the Note Extension Agreements that are Senior Claims."

28. County also contends that the fact that the Claim is not entitled to distribution under the Plan until it is deemed allowed somehow renders the Claim unclassified. However, this statement does not contradict the fact that the Claim is classified as a disputed claim until it is deemed allowed.

Also, County argues that differences in the treatment of the Taxable Notes claims are dictated by non-bankruptcy law. However, County provides no support for this proposition, nor does it indicate which non-bankruptcy law should govern. Furthermore, an allegation that equitable subordination would violate the Code properly turns on an analysis of Code § 1123(a)(4).

29. This provision prohibits municipalities from incurring excessive debt that will encumber revenues from subsequent fiscal years, unless the matter is put to a vote and two-thirds of the voters consent to the overage.

heavily on the following specific provision in the Disclosure Statement:

> The County has analyzed the issues ... and has reserved its rights throughout the County Chapter 9 case to contest the validity of [the 1994–95 Taxable Notes] indebtedness and any related purported security interest. *The County has determined not to pursue such a challenge to the Taxable Notes or to the related purported security interests, and has determined instead to treat claims relating to the Taxable Notes as specified in the Plan.*

Disclosure Statement, at 12 (emphasis added). The Noteholders contend that, by this statement, County intentionally relinquished its rights to pursue the invalidity defense. In addition, the master certificates state that the Taxable Notes are valid and not in violation of California law.[30] Finally, the Noteholders argue that County's conduct in paying out all claims on the Taxable Notes, except those of the Noteholders, is further evidence of waiver.

 The Ninth Circuit has held that "[w]aiver occurs when there is an existing right, a knowledge of its existence, and an actual intention to relinquish it, or conduct so inconsistent with the intent to enforce the right as to induce a reasonable belief that it has been relinquished." *United States v. Reliance Ins. Co.,* 799 F.2d 1382, 1386 (9th Cir.1986) (citation and internal quotations omitted). The determination of whether there is a waiver is usually a question of fact as the question of intent "necessarily depends on the factual circumstances of each case." *Sessions, Inc. v. Morton,* 491 F.2d 854, 858 (9th Cir.1974) (citations omitted). *See also CBS, Inc. v. Merrick,* 716 F.2d 1292, 1295 (9th Cir.1983) ("[T]he existence of a waiver is usually a fact question").

Here, County has set forth enough evidence to raise a triable issue of material fact regarding waiver. With respect to the cited portion in the Disclosure Statement to which the Noteholders rely, County argues that this statement merely reflects its intent not to pursue a challenge to the validity of the Taxable Notes as a whole. Instead, County intended this statement to mean that it would object to claims on a claim-by-claim basis.

County's Chief Executive Officer argues that County did not intend to waive any validity defense when she executed the Disclosure Statement and Plan.[31] Rather, County's intent was "to reserve every possible right, including the right to assert any defense, including validity defenses ... against any holder of the Taxable Notes." Declaration of Janice M. Mittermeier, at 1. Accordingly, the Disclosure Statement states that

> [t]he County continues to investigate its defenses, ... the counterclaims and/or rights of setoff or recoupment with respect to such claims that may be asserted by other holders of Class A–1 and B–1 Claims, and the County reserves its right to assert such rights, claims and defenses as appropriate.

*Id.* Specifically, with respect to the Noteholders, the Disclosure Statement provides:

> All Class A–1 and B–1 Claims held by Appaloosa Investment Limited Partnership I ... or any of their respective successors in interest are disputed by the County because the County has defenses, counterclaims and/or rights of setoff or recoupment with respect to such claims based upon the matters described in Sections IV.P and IV.P.4.

Disclosure Statement, at 75.

The Disclosure Statement also refers to County's ongoing examination into the validity of the Notes as follows: "The County is also investigating whether the amount of the Short–Term Debt violated Government Code

---

**30.** The master certificates state that "the Notes are issued and sold in conformity with the laws of the State of California ... and ... the Notes, together with all indebtedness and obligations of the County, do not exceed any debt limit prescribed by the Constitution and the statutes of the State of California." Bolin Affidavit, Exh. B, at 2.

**31.** "When I executed the Disclosure Statement and the Second Amended Plan of Adjustment (the "Plan") on behalf of the County, I did not intend to relinquish any right to assert any applicable defense, including any validity based defense, counterclaim, or right of setoff or recoupment against any holder of the Taxable Notes." Declaration of Janice M. Mittermeier, at 1.

section 53858, which limits County short-term borrowing to 85% of the revenues available for repayment of the Short–Term Debt." *Id.* at 45.

Similarly, under the terms of the Plan, County broadly preserved its right to "enforce any claims, rights and causes of action that the County may hold against any entity, including, without limitation, any claims, rights or causes of action under sections 544 through 550 of the Bankruptcy Code or any similar provisions of state law, or any other statute or legal theory." Plan, at 43.

Furthermore, as County notes, Appaloosa objected at the Disclosure Statement hearing on the ground that "the Disclosure Statement fails to disclose any basis for objecting to Appaloosa's claims." The tentative ruling was to overrule the objection, based upon my interpretation of County's response, which was as follows: "The County will 'assert all of the defenses, counter-claims, offsets and rights of recoupment with respect to that [Appaloosa's] claim.'" Appaloosa's counsel did not seek further clarification of the tentative ruling. Accordingly, my tentative ruling became final.

Therefore, a genuine issue of material fact exists as to whether County intended to waive its invalidity defense.

*ii. The Noteholders Have Not Established That County Is Barred By Res Judicata From Raising The Invalidity Defense.*

 The Noteholders contend that County is barred by res judicata from challenging the validity of the Notes. Specifically, the Noteholders argue that County has chosen to pay all allowed Class A–1 and B–1 claims in full, rather than contest the validity of the Notes. They further argue that because the Plan was confirmed, County is precluded from raising issues or claims that could have been raised pre-confirmation. *See First Union Comm. Corp. v. Nelson, Mullins, Riley & Scarborough (In re Varat Enters., Inc.),* 81 F.3d 1310, 1315–17 and n. 7 (4th Cir.1996); *In re Heritage Hotel Partnership I,* 160 B.R. at 377–78.

County responds that the cases cited are inapplicable. In those cases, unlike here, the debtors failed to raise any objection or reserve any right to object post-confirmation. Furthermore, County contends that res judicata does not prevent the assertion of post-confirmation objections if a debtor has reserved the right to object in its plan. *S.N.A. Nut Co. v. Tulare Nut Co. (In re S.N.A. Nut Co.),* 197 B.R. 642, 647–48 (Bankr.N.D.Ill. 1996). Here, the Plan specifically reserves County's right to bring any claim or cause of action against any entity. The Plan also contemplates that there would be objections filed post-confirmation. Additionally, the Disclosure Statement specifically reserves County's ability to object to any claim on the grounds of any defense, counterclaim, and right to setoff or recoupment.

As discussed earlier, "[i]f a confirmed plan expressly reserves the right to litigate a specific cause of action after confirmation, then res judicata does not apply." *In re Kelley,* 199 B.R. at 704 (citations omitted). In *Kelley,* the disclosure statement and the plan did not mention "specific claims or imminent lawsuits against the lender," but rather proposed to pay the lender's claim in full. *Id.* at 705. Accordingly, the Ninth Circuit held that the debtors were barred from asserting claims post-confirmation that could have been raised pre-confirmation. *Id.*

Here, although the Disclosure Statement did not specifically state that County would be raising validity defenses post-confirmation, the Disclosure Statement did state that these defenses would be "based upon the matters described in Sections IV.P and IV.P.4." Those referenced sections relate to County's adversary proceeding against Merrill Lynch in which County specifically raised the validity argument. Accordingly, the Noteholders have not satisfied their burden in establishing that County is precluded by res judicata from raising invalidity as a defense.

*iii. Judicial Estoppel Does Not Apply As A Matter Of Law.*

 The Noteholders contend that the doctrine of judicial estoppel also precludes County from asserting the invalidity

of the Notes as a defense. "Judicial estoppel precludes a party from asserting a position in a current legal proceeding which is contrary to the position that party previously asserted in another." *Stevens Technical Servs., Inc. v. SS Brooklyn*, 885 F.2d 584, 588 (9th Cir. 1989) (citations omitted). Under the majority position, judicial estoppel does not apply "unless the inconsistent assertion in the subsequent litigation was adopted in some manner by the court in the prior litigation." *Id.* (citations omitted). "Under the minority view, judicial estoppel can apply even when a party was unsuccessful in asserting its position in the prior judicial proceeding, 'if the court determines that the alleged offending party engaged in 'fast and loose' behavior which undermined the integrity of the court.'" *Ryan v. Loui (In re Corey)*, 892 F.2d 829, 836 (9th Cir.1989), *cert. denied*, 498 U.S. 815, 111 S.Ct. 56, 112 L.Ed.2d 31 (1990) (citation omitted). The Ninth Circuit has not adopted either position, but has analyzed both tests in determining whether judicial estoppel applies. *Rissetto v. Plumbers & Steamfitters Local 343*, 94 F.3d 597, 601 (9th Cir.1996); *Stevens Technical Servs.*, 885 F.2d at 588–89; *In re Corey*, 892 F.2d at 835–36.

The Noteholders contend that confirmation of the Plan in which the Notes are treated as valid constitutes an assertion in a prior proceeding that the Notes are valid. In the Objection to the Claim proceeding, the Noteholders assert that County is precluded from raising the invalidity argument.

County is correct that the Noteholders cannot show that County stated that the Notes were valid under California's debt limitation provision. Here, neither the treatment of the Taxable Notes as a disputed class under the Plan nor any statement in the Disclosure Statement affirms that the Notes are constitutionally valid.

Additionally, the Noteholders have failed to show that by approving the Plan and Disclosure Statement, I held that the Notes were constitutionally valid. Therefore, judicial estoppel is not applicable as a matter of law.

*iv. There Is A Genuine Issue Of Material Fact As To Whether Equitable Estoppel Applies.*

■ The Noteholders argue that the County is equitably estopped from raising the defense of constitutional invalidity because County failed to mention this defense in its Plan or Disclosure Statement and the Disclosure Statement indicated an intent not to pursue the invalidity argument with respect to the Taxable Notes. Furthermore, the Noteholders allege that County's conduct in paying over half a billion dollars on the Taxable Notes precludes County from now arguing that the Notes are invalid.

■ The Ninth Circuit has held that The traditional elements of equitable estoppel are that: (1) the party to be estopped knows the facts, (2) he or she intends that his or her conduct will be acted on or must so act that the party invoking estoppel has right to believe it is so intended, the (3) party invoking estoppel must be ignorant of true facts, and (4) he or she must detrimentally rely on the former's conduct.

*United States v. Hemmen*, 51 F.3d 883, 892 (9th Cir.1995) (citation omitted). "The elements of equitable estoppel ... are factual determinations." *In re Kelley*, 199 B.R. at 705.

The Noteholders have not set forth sufficient facts to establish these elements. Indeed, they have only touched upon the fourth element in that they allege that they detrimentally relied on County's purported actions by withdrawing their objection to the Plan and confirmation order. Therefore, the Noteholders have not met their burden in establishing that equitable estoppel applies here. Additionally, material issues of fact regarding the elements of equitable estoppel preclude granting the Noteholders' request.

*I. A Determination On The Merits Of The Setoff Defense Is Inappropriate Because Factual Issues Remain Unresolved.*

■ County has specifically preserved its right to bring a setoff action against the Noteholders under the terms of the Disclosure Statement. Disclosure Statement, at

75. County brings its setoff claim under California Code of Civil Procedure § 431.70, which provides that:

> Where cross-demands for money have existed between persons at any point in time ... and an action is thereafter commenced by one such person, the other person may assert in the answer the defense of payment in that the two demands are compensated so far as they equal each other.... Neither person can be deprived of the benefits of this section by the assignment or death of the other.

Cal.Code Civ.Pro. § 431.70 (1997).

The Noteholders do not dispute that County is legally entitled to assert setoff. Rather, they argue that setoff is an equitable remedy and the equities of the case do not warrant setoff. The Noteholders argue that because setoff is a discretionary doctrine, the court may deny setoff. *First Nat'l Bank of Portland v. Dudley*, 231 F.2d 396, 398 (9th Cir. 1956); *Kaiser Steel Corp. v. Frates (In re Kaiser Steel Corp.)*, 110 B.R. 20, 26 (D.Colo. 1990) (citation omitted). County, on the other hand, argues that the equities weigh in favor of authorizing setoff. As stated before, the evaluation of the equities of the case necessarily depends on the resolution of many factual issues. A motion for summary judgment is not the proper place for such determinations. Therefore, a determination on the merits of setoff is premature at this juncture.

County's primary response it that "setoff is the rule" under California law unless "a judicial limitation on such remedy can be shown." Opposition, at 49. (citing *Jess v. Herrmann*, 26 Cal.3d 131, 133, 161 Cal.Rptr. 87, 604 P.2d 208 (1979)). To the extent that County's argument is that setoff must be applied, absent a "judicial limitation," the case law is clear that setoff is an equitable remedy, to be applied at the discretion of the court. "The California Supreme Court has recently stated that the section [Cal.Code. Civ.Pro. 431.70] does not establish 'an ironclad setoff rule that must be invariably applied notwithstanding the equities of the case or potential conflict with other state policies.'" *Crocker Nat'l Bank v. Rockwell Int'l Corp.*, 555 F.Supp. 47, 51 (N.D.Cal.1982) (citing *Jess*, 26 Cal.3d at 135, 161 Cal.Rptr. 87, 604 P.2d 208). Accordingly the determination of whether to apply setoff is within my discretion. However, that determination will necessarily depend on factual determinations regarding the Noteholders' good faith status under this case, as discussed earlier. Therefore, a determination as to whether setoff applies now is premature.

## IV. CONCLUSION

In determining the rights of County with respect to the Claim, California law governs. Article 8 of the Cal. Comm. was significantly revised, effective January 1, 1997, to address the need to deal with the rights of indirect holders. Accordingly, Cal. Comm. § 8603 (1997) favors the use of Revised Article 8.

Under the provisions of Revised Article 8, the Notes are certificated securities. However, the Noteholders are not "holders" within the meaning of Cal.Comm.Code § 8114(c) (1997), because that section relates to entities in possession of certificated securities. The Noteholders are indirect holders, and are, therefore, more properly classified as "entitlement holders" under Cal.Comm.Code § 8102(a)(7) (1997). Accordingly, the Noteholders are not entitled to the presumption under Cal.Comm.Code § 8114(c) that upon presentment of the Notes, County must honor the Claim unless it can allege a defense or defect going to the validity of the defense. However, if it is shown that the Noteholders are entitled to protection under Revised Article 8, part 5, County may be precluded from raising any causes of action against the Claim. That determination involves genuine issues of material facts that are not before me yet.

As a matter of law, neither County nor the Committee are entitled to assert equitable subordination against the Claim on two grounds. First, the Plan and Disclosure Statement do not adequately reserve for County or the Committee the right to assert equitable subordination post-confirmation. As such, res judicata bars an attempt to raise matters that should or could have been raised pre-confirmation. Second, County and the Committee are barred from assert-

ing equitable subordination because under the Ninth Circuit test, three elements must be satisfied. Here, the third element, that equitable subordination does not conflict with the Code, has not been satisfied, because equitable subordinate of the Claim post-confirmation would conflict with Code § 1123(a)(4), which requires the same treatment for each claim within a class unless the claimant agrees to a less favorable treatment. Furthermore, County does not have standing to raise the equitable subordination issue.

Summary judgment is inappropriate at this time regarding County's invalidity defense. Issues of material fact need to be resolved with respect to waiver, res judicata, and equitable estoppel. As a matter of law, judicial estoppel does not apply.

Finally, the determination of whether County is entitled to setoff is a factual determination that cannot be decided through the Motion.

Separate findings of fact and conclusions of law with respect to the Motion are unnecessary. This memorandum opinion shall constitute my findings of fact and conclusions of law.